ROSALYN SIEGEL, executrix,[1] vs. NEW ENGLAND MERCHANTS
NATIONAL BANK.

Suffolk.    March 4, 1982. — July 1, 1982.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, & O'CONNOR, JJ.

*Negotiable Instruments*, Defenses, Drawer.  *Bank.  Negligence*, In cash-
ing check.  *Subrogation.*

A bank which pays its depositor's postdated check before maturity must
    recredit the depositor's account but may then assert against the deposi-
    tor any rights acquired by prior holders on either the instrument or the
    transaction from which it arose.  [675]
On appeal by a bank from a judgment in favor of its depositor in the
    amount of a postdated check which the bank paid before maturity,
    this court held that the bank was entitled to further consideration of its
    subrogation claims, and that, on remand, the bank would have the
    responsibility for asserting its subrogation rights and establishing the
    status of the parties in whose place it claimed, but the depositor would
    have the burden of proving any facts that might demonstrate a loss.
    [675-680]
In an action by a depositor to recover damages from a bank which paid
    the depositor's postdated check prematurely, there was no merit to the
    bank's claim against the depositor, asserting that it was a holder in due
    course of the check, where the check had been paid and had left the
    bank's possession [680]; nor was the depositor required to return the
    check to the bank before he was entitled to have the amount improper-
    ly paid credited to his account [680-681].

CIVIL ACTION commenced in the Superior Court on Feb-
ruary 13, 1975.

The case was heard by *Mitchell*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

---

[1] David Siegel, now deceased, was the original plaintiff in this case.

*Donald N. Sweeney (Frank L. McElroy* with him) for the defendant.

*Mark A. Michelson* for the plaintiff.

HENNESSEY, C.J.   We are called upon to define the respective rights of a bank and its depositor when the bank has paid a postdated check before maturity and deducted the amount of the check from the depositor's account.   Applying the Uniform Commercial Code, G. L. c. 106, we conclude that the bank must recredit the depositor's account, but may then assert against the depositor any rights acquired by prior holders on either the instrument or the transaction from which it arose.   In the course of this opinion, we shall describe the parties' responsibilities of proof with respect to the bank's subrogation claim.   We remand for a further hearing on the question of subrogation.

The plaintiff's decedent, David Siegel, maintained a checking account with the defendant, New England Merchants National Bank.   On September 14, 1973, Siegel drew and delivered a $20,000 check to Peter Peters, postdated November 14, 1973. Peters immediately deposited the check in his own bank, which forwarded it for collection.   The defendant bank overlooked the date on the check, and, on September 17, paid the item and charged it against Siegel's account.   Siegel discovered the error in late September when another of his checks was returned for insufficient funds.   He informed the bank that the check to Peters was postdated November 14, and asked the bank to stop payment of the check.[2]   Later, he requested that the bank return the $20,000 to him.

---

[2] Siegel testified, and the judge found, that Siegel stopped payment, first orally and later in writing, when he learned of the bank's action. The bank contends, however, that Siegel's testimony was not believable and that the judge's finding was erroneous.   The bank also argues that the judge should have permitted it greater leeway in its efforts to impeach Siegel on cross-examination.   Credibility is, of course, a question for the trier of fact (here, the judge).   Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974).   *Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 702 (1972).   The scope of cross-examination, too, was within the judge's sound discretion, and we find no abuse of discretion on the present rec-

When the bank refused to restore the $20,000, Siegel brought this action for wrongful debit of his account. The bank denied liability, raised defenses of waiver, estoppel, and ratification, and filed counterclaims asserting rights on the instrument and rights of subrogation. Two banks in the collecting chain became parties, one permitted to intervene as a party defendant and the other impleaded by the bank. The bank also impleaded Peters, the payee, who filed a suggestion of bankruptcy. The case was later dismissed as against the two collecting banks.

After a trial, jury-waived, the judge found that the check was postdated by agreement between Peters and Siegel, without fraudulent purpose, and that Siegel had acted with reasonable speed to inform the bank of the error. He also found that Peters had paid no money to Siegel since receiving the check. The judge ruled that (1) the check was a negotiable instrument; (2) the check was not payable until November 14; (3) the bank was negligent in paying it before that date; (4) the bank had no right to debit Siegel's account; (5) Siegel had not waived his rights or ratified the bank's action and was not estopped from demanding the $20,000; and (6) the wrongful debit caused Siegel a loss of $20,000. He also rejected the bank's counterclaims as having no merit. He then entered judgments for Siegel against the bank in the amount of $20,000, for Siegel on the bank's counterclaims, and for the bank against Peters for $20,000.[3] The bank appealed, and we transferred the case to this court on our own motion. We vacate the judgment and remand the case for further consideration of the bank's subrogation claims.

ord. In addition, most of the excluded questions concerned communications between Siegel and his attorney. We see no reason to recite the questions asked by the bank and excluded by the judge, particularly because the stop payment order plays no part in our decision. If there had been error, it would have been harmless.

[3] The judge ruled that Peters's debt to the bank was not dischargeable in bankruptcy, so that the bankruptcy proceeding against Peters did not bar entry of judgment for the bank against him. Peters has not appealed, and this ruling is not at issue.

1. *Wrongful Debit and Subrogation.*

The parties agree that the bank should not have paid the check when Peters presented it on September 14, and had no right at that time to charge it against Siegel's account. G. L. c. 106, §§ 3-114, 4-401 (1). See *Smith* v. *Gentilotti*, 371 Mass. 839, 840 (1977). Their differences center instead on whether the bank's wrongful action caused Siegel any loss, so as to entitle him to damages. Siegel contends, and the judge ruled, that his loss must be $20,000 because that amount was debited from his account. The bank contends that there was no loss, because Siegel drew the check with the intention that it eventually be paid, and the bank could rightfully have charged it against his account on November 14. We believe that the drafters of the code anticipated disputes such as this, and provided a logical system for their resolution.

We begin with G. L. c. 106, § 4-401 (1), which governs bookkeeping between depositor and bank. A bank may charge any "properly payable" item against its depositor's account.[4] Implicitly, the bank may not charge items, such as postdated checks, that are not properly payable. If the charge is unauthorized, it follows that the depositor has a valid claim to the amount of the charge by virtue of the account itself. Cf. *Stone & Webster Eng'r Corp.* v. *First Nat'l Bank & Trust Co.*, 345 Mass. 1, 5 (1962) (relationship of bank and depositor as debtor and creditor).

As the bank points out, the depositor's realization of this claim may produce unjust enrichment. Even when an item is not properly payable, due to prematurity or a stop payment order, the bank's payment may discharge a legal obligation of the depositor, or create a right in the depositor's favor against the payee. See G. L. c. 106, §§ 3-601 (1) (*a*), 3-603 (1), 3-802 (1) (*b*); J. White & R. Summers, Uniform

---

[4] General Laws c. 106, § 4-401 (1), as appearing in St. 1957, c. 765, § 1, provides in full that "[a]s against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft."

Commercial Code 542 (2d ed. 1980). If the depositor were permitted to retain such benefits, and recover the amount of the check as well, he would profit at the bank's expense. Therefore, § 4-407 provides that upon payment, the bank is "subrogated" to any rights prior holders may have had against the drawer-depositor, on either the check or the initial underlying transaction, and to any rights the drawer may have against the payee or other holders. G. L. c. 106, § 4-407.[5] See *Southeast First Nat'l Bank* v. *Atlantic Telec, Inc.*, 389 So. 2d 1032, 1033 (Fla. Dist. Ct. App. 1980); *Mitchell* v. *Republic Bank & Trust Co.*, 35 N.C. App. 101, 103-104 (1978); *Peck* v. *Franklin Nat'l Bank*, 4 U.C.C. Rep. Serv. 861, 862 (N.Y. App. Term 1967); J. White & R. Summers, *supra* at 559-561. See also *Universal C.I.T. Credit Corp.* v. *Guaranty Bank & Trust Co.*, 161 F. Supp. 790, 794 (D. Mass. 1958) (pre-code case).

Thus, the code fixes the rights of the bank and the depositor by a two-part adjustment. The depositor has a claim against the bank for the amount improperly debited from its account, and the bank has a claim against the depositor based on subrogation to the rights of the payee and other holders. The bank may assert its subrogation rights defensively when its depositor brings an action for wrongful debit. See *Universal C.I.T. Credit Corp.* v. *Guaranty Bank & Trust Co.*, *supra* at 794-795.

---

[5] General Laws c. 106, § 4-407, as appearing in St. 1957, c. 765, § 1, provides in full that "[i]f a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights (*a*) of any holder in due course on the item against the drawer or maker; and (*b*) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and (*c*) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."

At the time a bank asserts subrogation rights, the check will of course have been paid, and prior holders will have no rights against the drawer. See G. L. c. 106, §§ 3-601 (1) (*a*), 3-603 (1), 3-802 (1) (*b*). Therefore, we understand § 4-407 to refer to rights existing prior to the payment.

Here, the bank asserted a subrogation claim based on the rights of Peters, the payee.[6] Neither party, however, introduced evidence concerning Peters's rights against Siegel.[7] A question then arises as to what matters each party was obligated to prove in order to prevail.

Section 4-403 (3) of the code provides that when the problem is one of improper payment over a stop order, the "burden of establishing the fact and amount of loss . . . is on the customer." G. L. c. 106, § 4-403 (3). Here, of course, the bank's liability is for premature payment rather than for payment over a stop order. Nevertheless, these two forms of improper payment have in common the problem of unjust enrichment, and we believe that § 4-403 (3) is a source of useful analogy.

The rule of § 4-403 (3), that a depositor must prove his loss, may at first seem at odds with our earlier conclusion that § 4-401 (1) provides the depositor with a claim against

---

[6] The bank waived all claims based on the rights of the collecting banks.

[7] The trial judge did find that the transaction between Peters and Siegel arose out of Siegel's sale of a shopping mall to Peters, and Peters's subsequent default on payments due Siegel on notes, and that Siegel and Peters had agreed to the postdating of the check. He also found that Peters had "made no payment to [Siegel] since he received the check, either as payment on the notes or as a repayment of the $20,000 extended by the check." The bank objects to these findings on the ground that there is no evidence in the record to support them. The bank appears to be correct on this point. In any event, the judge's findings, while they tend to suggest that the transaction was a loan, do not clearly establish either that Peters was entitled to receive the money on November 14, or that Siegel had a right to cancel the transaction before the check became due. It should be noted that the mere circumstance that the transaction was a loan, and that the loan had since proved uncollectible, would not necessarily mean that the bank's premature payment had caused the depositor a loss. If the payee was unconditionally entitled to receive the loan, the risk that he would not repay it was a risk the depositor assumed in making the loan, and was not increased by the bank's action. Section 4-407, by extending the bank's subrogation to rights on the instrument as well as to rights on the transaction, makes clear that the depositor could not recover in this situation. Thus, to defeat the bank's subrogation rights the depositor must establish a condition on the right to cash the check, an element of fraud, or some other defense good against the payee as a holder of the instrument.

the bank in the amount of the check, leaving the bank with recourse through subrogation under § 4-407. See *Mitchell* v. *Republic Bank & Trust Co.*, 35 N.C. App. 101, 104 (1978); *Thomas* v. *Marine Midland Tinkers Nat'l Bank*, 86 Misc. 2d 284, 288-289 (N.Y. Sup. Ct. 1976); J. White & R. Summers, *supra* at 684-691. We believe, however, that § 4-403 (3) was intended to operate within the process of credit and subrogation established by §§ 4-401 (1) and 4-407. See Comment 8 to § 4-403 of the Uniform Commercial Code, 2A U.L.A. (Master ed. 1977). When a bank pays an item improperly, the depositor loses his ability to exercise any right he had to withhold payment of the check. His "loss," in other words, is equivalent to his rights and defenses against the parties to whose rights the bank is subrogated — the other party to the initial transaction and other holders of the instrument. Section 4-403 (3) simply protects the bank against the need to prove events familiar to the depositor, and far removed from the bank, before it can realize its subrogation rights. The depositor, who participated in the initial transaction, knows whether the payee was entitled to eventual payment and whether any defenses arose. Therefore, § 4-403 (3) requires that he, rather than the bank, prove these matters. Cf. *Knowles* v. *Gilchrist Co.*, 362 Mass. 642, 651-652 (1972) (when goods are damaged in the hands of a bailee, bailee, who is best informed, must establish due care).

This view of the three relevant sections of the code suggests a fair allocation of the burden of proof. The bank, which has departed from authorized bookkeeping, must acknowledge a credit to the depositor's account. It must then assert its subrogation rights, and in doing so must identify the status of the parties in whose place it claims. If the bank's subrogation claims are based on the check, this would entail proof that the third-party subrogor was a holder, or perhaps a holder in due course. This responsibility falls reasonably upon the bank, because it has received the check from the most recent holder and is in at least as good a position as the depositor to trace its history.

The depositor must then prove any facts that might demonstrate a loss. He must establish defenses good against a holder or holder in due course, as the case may be. See G. L. c. 106, §§ 3-305, 3-306. If the initial transaction is at issue, he must prove either that he did not incur a liability to the other party, or that he has a defense to liability. Thus the bank, if it asserts rights based on the transaction, need not make out a claim on the part of its subrogor against the depositor. Responsibility in this area rests entirely with the depositor, who participated in the transaction and is aware of its details. Further, the depositor must establish any consequential loss.[8]

A further hearing is necessary to determine the question of subrogation in the present case. The judge ruled that the check was a negotiable instrument, see G. L. c. 106, § 3-114 (1), and the evidence at trial fairly indicated that Peters was a holder. See G. L. c. 106, § 1-201 (20). Thus the burden, under the rules we have set out, was upon Siegel to prove a defense good against a holder of the instrument. However, the trial record makes clear that neither the parties nor the judge was proceeding with these rules in mind. Indeed, the judge excluded, at the bank's strenuous request, evidence offered by Siegel concerning the transaction between Siegel and Peters.[9] We believe, therefore, that Siegel's

---

[8] Several courts have harmonized § 4-403 (3) with §§ 4-401 (1) and 4-407 in terms of shifting burdens of production and persuasion. "Simply because a bank pays a check over a stop payment order does not entitle the customer to recover damages against the bank, but it does establish a *prima facie* case for the customer. The bank must present evidence to show absence of loss, or the right of the payee of the check to receive payment. Then the customer must sustain the ultimate burden to show why there was a defense to payment of the item." *Southeast First Nat'l Bank* v. *Atlantic Telec, Inc.*, 389 So. 2d 1032, 1033 (Fla. Dist. Ct. App. 1980). *Mitchell* v. *Republic Bank & Trust Co.*, 35 N.C. App. 101, 104 (1978). *Thomas* v. *Marine Midland Tinkers Nat'l Bank*, 86 Misc. 2d 284, 290-291 (N.Y. Sup. Ct. 1976). Although our analysis will often have the same result as that of the cited cases, it may in some cases give greater force to § 4-403 (3).

[9] The bank objected to a number of questions, asked on direct examination of Siegel, concerning the agreement between Siegel and Peters. Al-

executrix should have an opportunity to present evidence that Siegel suffered a loss.

2. *Other Claims and Defenses.*

Several other arguments offered by the bank to escape or counteract its liability can be disposed of quickly. First, the bank asserts a claim against Siegel in its own right, contending that it is a holder in due course of the check. This argument is without merit because the check has been finally paid and is not in the bank's possession. See G. L. c. 106, §§ 3-603 (1), 3-601 (3) (*a*); J. White & R. Summers, *supra* at 536, 661. But see *Roland* v. *Republic Nat'l Bank*, 463 S.W.2d 747, 749-750 (Tex. Civ. App. 1971).

The bank also argues that the judge erred in rejecting its affirmative defenses of waiver, estoppel, and ratification. In support of these defenses, the bank argues that Siegel did not make a timely complaint about the debit from his account. The judge found, however, that Siegel "took action within a reasonable amount of time to inform the Bank of its wrongful action," and this finding has support in the evidence.[10] See Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1975). The bank also points out that Siegel did not return the check to the bank. There is no indication in the code, however,

---

though some of the bank's objections were based on hearsay, others were general and could only have been based on irrelevancy. The judge sustained the series of objections only after the bank asserted that it would not inquire into any conversations between Peters and Siegel. In these circumstances, the bank may not rely on Siegel's failure of proof as a ground for judgment in its favor on the record. See *Owens* v. *Dinkins*, 345 Mass. 106, 110-111 (1962).

[10] Siegel testified that in late September, 1973, he drew another check which was returned for insufficient funds. He stated that when the check was returned, he called the bank, discovered that the check to Peters had been cashed, told the bank that the check was not yet payable, and stopped payment. It appears, therefore, that Siegel acted as soon as he knew of the error. Further, Siegel testified, and the judge found, that Siegel informed a loan officer of the erroneous debit, and asked that the bank apply $14,000 to an outstanding loan, and return $6,000 to Siegel in cash. Although Siegel was not certain of the date of this conversation, he stated that it occurred before the end of 1973. We have already stated in note 2, *supra*, that the credibility of Siegel's testimony was for the judge to assess.

that a depositor must return a cancelled item to the bank before he is entitled to credit for an improper debit under § 4-401 (1). Finally, the bank contends that Siegel should have renewed his stop payment order when it expired in April, 1974. See G. L. c. 106, § 4-403 (2). The order, however, was not the basis of Siegel's claim, and in any event the check had already been paid.

In sum, Siegel had a valid claim against the bank for premature payment in the amount of the item paid, but the bank was entitled to assert the rights of prior holders on the check and on the transaction from which it arose. We vacate the judgment and remand for a further hearing to determine those rights. At the hearing, the bank must establish the status of its subrogor. Siegel's executrix must establish any defenses to liability on the instrument as well as the absence of rights or presence of defenses on the underlying transaction.

*So ordered.*