[Civ. No. 67129. Second Dist., Div. Five. Feb. 10, 1984.]

CURTIS B. DANNING, as Trustee, etc., Plaintiff and Respondent, v. BANK OF AMERICA, Defendant, Cross-complainant and Appellant; HAROLD GOLDSTEIN et al., Cross-defendants and Respondents.

[redacted]

## COUNSEL

Zobrist & Vienna, Zobrist, Vienna & McCullough, Burton V. McCullough, George W. Coombe, Jr., Ullar Vitsut and Elizabeth A. Shaw for Defendant, Cross-complainant and Appellant.

Sidley & Austin, Thomas E. Garcin, Richard T. Peters and Patrick J. Coughlin for Plaintiff and Respondent.

No appearance for Cross-defendants and Respondents.

## OPINION

SWINK, J.*—

### INTRODUCTION

This is an action brought by the trustee in bankruptcy of the estate of a bankrupt corporation against a payor bank for allegedly paying a check without proper authorization and charging the amount thereof against the bankrupt's account.

Goldstein, Samuelson, Inc. (GSI) was a California corporation engaged in the business of writing and marketing options on internationally traded commodities.

Commopts, Inc. (Commopts) was a California corporation and an agent of GSI for the purpose of selling GSI options on a commission basis.

---

*Assigned by the Chairperson of the Judicial Council.

GSI's depository was Bank of America (B/A), at which GSI opened a checking account at the Wilshire-San Vicente (Wilshire) office of B/A in the name of GSI and designated it as the "general account."

The drawer of a $250,000 check was GSI. The payee was Commopts whose bank was Camino-California Bank (Camino), at which Commopts maintained its checking account.

The plaintiff is Curtis B. Danning (Danning), trustee in bankruptcy of GSI, the bankrupt. The defendant is B/A, which is also the appellant as well as a cross-complainant against cross-defendants Harold Goldstein, John Reed, Commopts, Inc., Eric G. Vesely and Lynette Burgett.

Several stipulations between the parties are set forth in the trial court's findings of fact which are deemed to be facts in this case.

## PLEADINGS

On March 29, 1973, an involuntary petition in bankruptcy was filed against GSI; on April 30, 1973, GSI was adjudicated a bankrupt, and on July 27, 1973, Danning was appointed the trustee in bankruptcy of the estate of GSI. The bankruptcy court then ordered that the claims of salesmen and agents would be subordinated to the claims of all other GSI's creditors.

In his capacity as trustee in bankruptcy of GSI, Danning, on April 29, 1975, filed his complaint against B/A alleging that B/A had improperly paid a $250,000 check and that GSI had not authorized payment thereof. B/A filed its answer to the complaint and its cross-complaint on February 4, 1976.

The cause was tried in the Superior Court of Los Angeles County on December 3, 4 and 5, 1980. On April 30, 1981, judgment was entered on the complaint in favor of Danning and against B/A in the sum of $250,000 together with interest thereon from March 5, 1973. B/A filed its notice of intention to move for a new trial on May 15, 1981, which was denied on June 23, 1981. On the cross-complaint, B/A recovered judgment by default against cross-defendants.

The pleadings basically are the complaint, answer of B/A, cross-complaint of B/A, and answers of some cross-defendants. The complaint consisted of two causes of action, the first being a breach of contract action and the second being a negligence cause of action.

## DOCUMENTS

In early January of 1973, John Reed (Reed), GSI's controller; William Haines (Haines), GSI's vice president and treasurer; Enzo Provenza (Provenza), vice president of the bank's Wilshire-San Vicente office; and another bank representative participated in a series of meetings to discuss the opening of several GSI accounts and services to be performed by the bank with regard to such accounts. There was to be a general account and a trust account. It was expected that there would be a high volume of checks which would require a check sequencing service, which the bank would provide and charge for that service and reconcilement.

Other involved executives of GSI were Art Maslansky (Maslansky), Harold Goldstein (Goldstein), the president of GSI and Pat McGarry (McGarry).

On January 2, 1973, B/A and GSI executed a series of documents which were to govern the operation of the various accounts. Such documents were: (1) the bank-depositor agreement for the GSI's general and trust accounts, (2) signatures on white stickers later to be affixed to the file guide cards for the accounts, and (3) a report of call. Within a few days thereafter, GSI delivered a letter of instructions to B/A. B/A made the changes called for by such letter, including placing the stickers and writing the word "caution" on the file guide cards. Essentially, the governing documents were the bank-depositor agreement, file guide card, and letter of instructions, all of which collectively will be referred to as deposit contract.

As to checks issued by GSI, the deposit contract provided:

"All checks over $10,000 must have either Art Maslansky's or Bill Haines' signature. All checks between $1,000 and $10,000 must have any two (2) of the following signatures. Any check under $1,000 must have any one (1) of the following signatures."

After discussion with Haines, Provenza's understanding was that all checks over $10,000 would require either Haines' or Maslansky's signature *plus* one of the other listed signatures. Thereafter, Provenza changed the signature card by placing a sticker on it which read: "All checks over $10,000 must have Art Maslansky or Bill Haines signature - but must have two signatures. Any checks under $1,000 may have one signature."

### ISSUANCE OF CHECK

On January 2, 1973, GSI opened a checking account at the Wilshire B/A in the name of GSI as its general account. As of February 20, 1973, GSI's

and Commopts' books showed that GSI owed Commopts commissions in the amount of $736,314.32. On February 20, 1973, GSI issued and delivered to Commopts its check drawn against the GSI's general account at B/A in the amount of $250,000 allegedly in partial payment of commissions owed by GSI to Commopts. Such check was signed only by Goldstein and Reed, and therefore did not comply with the written deposit contract.

On February 21, 1973, a partner of Commopts, Eric Vesely, took the check to B/A and attempted to cash it. B/A refused because of lack of proper signatures. Commopts then endorsed the $250,000 check for deposit only and deposited the check to its checking account at Camino on February 21, 1973. The check was thereafter processed in the ordinary course of business and received by the data processing center of B/A on February 22, 1973. GSI's general account was thereafter charged with the amount thereof. The processing center retained possession of the check on Friday, February 23, 1973, for the purpose of reconciling the GSI's general account and sequencing, and thereafter delivered the check to the Wilshire office on February 26, 1973.

On February 26, 1973, a bank employee noted that neither Maslansky nor Haines had signed the check and such employee showed it to Provenza who immediately recognized that the check lacked either of the required signatures. Provenza made calls to Haines and Maslansky but was unsuccessful in reaching them. Finally, Provenza spoke with Reed who had signed the check but was not a corporate officer. Reed told Provenza that he would try to get someone to call Provenza—either Maslansky or Haines, and verify that the check was okay. Haines had never told Provenza that Reed was authorized to approve checks lacking proper signatures. Because of the amount involved and the failure to hear from Haines, Provenza decided to return the check to Camino bank "just to be on the safe side."

Later that day, Provenza met with Haines. Haines had resigned from GSI on February 23 and was in the bank to cash his termination check. Provenza showed him the check in question and asked him to sign it. Haines refused because he was no longer an officer of GSI. After such conversation, Provenza reversed the provisional charge to GSI's account, credited the account for the amount of the check and returned the check to Camino bank.

Still on February 26, B/A was notified that the Securities Exchange Commission (SEC) was "stepping into the picture" of the business of GSI.

On February 27, the bank learned of more developments such as there having been an equity receiver appointed by order of United States District Court and B/A was given a copy of the first page of the order; and a

promised telegram was read over the telephone to Provenza and later delivered to him. The telegram ordered the bank not to pay any item against GSI account. By this time, Camino bank had already paid the money to Commopts.

On February 28, 1973, the check was delivered to Camino bank. On that same day, Camino bank refused to accept the check back for the reason that it was a "late return," and returned it that day to B/A. On March 5, 1973, B/A received the check back from Camino bank and reversed the reversal of the charge made on February 26, 1973.

### AUTHORITY TO SIGN

■ The relationship between a payor bank and its customers is that of debtor and creditor, being founded upon contract, and the bank is under a duty to pay checks only in strict accordance with its customer's order. (*Allen* v. *Bank of America* (1943) 58 Cal.App.2d 124, 127 [136 P.2d 345].) The bank is without authority to charge its customer's account with an unauthorized order, and payment of such is said to have been made out of the bank's own funds. (*Basch* v. *Bank of America* (1943) 22 Cal.2d 316, 321 [139 P.2d 1].)

California Uniform Commercial Code section 3401, subdivision (1) provides that a person is not liable on an instrument unless his signature appears thereon. California Uniform Commercial Code section 3404, subdivision (1) states that an unauthorized signature which, under California Uniform Commercial Code section 1201, subdivision (43) includes one made without actual, implied or apparent authority, is wholly inoperative as the signature of a person whose name is signed.

■ By negative implication, a check with an unauthorized signature is not properly payable, and the bank breaches its agreement with its customer when paying such an item. (Cal. U. Com. Code, § 4401, subd. (1); *Hardex-Steubenville Corporation, Inc.* v. *Western Pennsylvania National Bank* (1971) 446 Pa. 446 [285 A.2d 874, 876].)

In determining whether or not the check was properly signed, it is undisputed that the check was not signed by either Haines or Maslansky. Therefore, *based on the documentation only* in paying the check, B/A breached the written terms of the deposit contract.

### EXECUTED ORAL MODIFICATION

Appellant urges the court to adopt its theory of there being an executed oral agreement serving to modify the written agreement. Appellant contends

that the terms of such executed oral agreement were: (1) Any check not signed in accordance with the written instructions would be paid and not returned by B/A unless B/A was specifically instructed to do so by either Haines, Maslansky, Reed or McGarry, acting for GSI; (2) that B/A was to call GSI upon receipt at the Wilshire office of any check not signed in accordance with the written instructions; and (3) that Haines or Maslansky would later sign the check, but such signing was not a further condition to B/A paying the check instead of returning it.

■ Respondent urges that the evidence offered by the bank to support an oral modification of the deposit contract is beyond the scope of, and in variance with, its own pleadings. Also, that an excuse for nonperformance in accordance with the tenor of the original contract must be pled specially. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 913, 915, at pp. 2501, 2502.) Respondent further asserts that none of the bank's affirmative defenses which are pled in its answer even remotely suggest any oral modification of the deposit contract.

In response to the allegations of paragraphs 6 and 8 of the trustee's complaint, the bank answered as follows: "The best evidence of the terms and conditions of the agreement between the parties . . . is the original signature card and . . . documents pertaining thereto . . . ." Because the oral modification issue was not clearly set forth in the answer, such oral modification was beyond the scope of the issues framed by the pleadings and should be ignored. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 335, p. 3137.)

■ However, even if the purported oral modification had been properly pled, appellant's argument that the written deposit contract was modified by an executed oral agreement ignores the fundamental doctrine of appellate practice that where the evidence is in conflict, the appellate court will not disturb the judgment or the findings of the trial court. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238.)

A review of the evidence does not clearly support appellant's position that there was an executed oral agreement. There was evidence pro and con. The trial court made its findings of fact and conclusions of law, and conclusion of law No. 4 states that "4. The bank-depositor agreement, file guide card and letter of instructions (Plaintiff's Exhibits 1, 2 and 3) constituted a valid, binding and enforceable contract between GSI and the bank (hereinafter the 'deposit agreement')." Also, conclusion No. 5 clearly sets forth that the GSI general account was governed by the terms and provisions of the deposit contract as set forth in the bank-depositor agreement, file guide card and letters of instructions which were plaintiff's exhibits 1, 2 and 3. Additionally, finding of fact No. 17 is that during the period of

January 2, 1973, through February 27, 1973, no attempt was made by either GSI or the bank to alter or change in writing the required signatories for checks in excess of $10,000 drawn on the general account of GSI.

In *partial* support of the aforesaid findings and conclusions re there not being an oral executed modification, there was testimony that:

1. Provenza was cross-examined regarding the episode of his conversation with Haines, and Provenza admitted that even after the "riot act" episode with Haines, he regarded himself and the bank bound by the terms of the original deposit contract.

2. Provenza could have simply asked Haines to provide the bank with an amended letter of instructions or an amended signature card if he had any faith in there being an oral executed agreement. Provenza unequivocally testified that he made no request to amend the deposit contract.

3. The trial judge asked Provenza whether he received approval on the $250,000 check. Provenza replied "yes and no."

4. Provenza admitted that Haines never told him that Reed was authorized to approve checks.

5. Even though Reed signed the check, it did not have the required signatures. Reed could not ratify the check because he signed the check without authority.

6. When Provenza decided to return the check to Camino bank, the only logical explanation for doing so was that he did not believe that the written deposit contract had been orally modified.

7. Haines testified that he told Provenza that if an improperly signed check came through, Provenza could call either Haines or Maslansky and they would either come down and sign or approve it. He also testified that there was not a single improperly signed check which was cashed without his signature or authorization.

8. B/A failed to introduce a single check which it paid and was drawn on the general account which was not eventually signed by Haines.

9. B/A introduced into evidence only six out of the nearly ten thousand checks which were written on GSI's accounts between January 2 and February 22 which were improperly signed in the first instance, and only one such check in excess of $10,000.

10. When Vesely tried to cash the check at B/A in person, the bank refused to pay the check because the check lacked the required signatures.

11. Testimony of the bank's own witness contradicts the contention that the executed oral modification occurred.

Still, B/A insists that such a conclusion would be in error since the trial court failed to make necessary findings with respect to any oral modification that occurred although specifically requested to do so. B/A maintains that the findings of fact, cited *ante,* relate solely to the written terms and conditions of the contract between the parties, and fail to address any of the issues raised by the oral modification or course of dealing. It is argued that conclusions 4 and 5 merely recite that the therein identified written documents "constitute a valid, binding and enforceable contract between GSI and the bank" and that "the GSI general account was governed" by those documents.[1]

Accordingly, inasmuch as an adjudication against B/A on the issue of the existence or nonexistence of an oral modification could be achieved by inference only, Code of Civil Procedure section 634 would preclude such an inferential conclusion at the appellate level.

■ Certainly, "it is accepted that 'When findings on material subsidiary issues of fact are requested or when the omission of such findings is brought to the trial court's attention prior to entry of judgment, the trial court is required to make such findings. If it does not do so, it cannot be inferred on appeal that the trial court found in favor of the prevailing party on the issues covered by the requested findings. (Code Civ. Proc., § 634 . . . .) A "material" issue of fact is one which is relevant and essential to the judgment and closely and directly related to the trial court's determination of the ultimate issue in the case.' (*Kuffel* v. *Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565 [138 Cal.Rptr. 575].)" (*Lynch* v. *Cook* (1983) 148 Cal.App.3d 1072, 1080 [196 Cal.Rptr. 544].) True enough, the court need only set forth ultimate facts and legal conclusions rather than evidentiary facts. (*Ibid.*)

■ In the instant case, although the court made no specific finding regarding the existence of an oral modification, such is not reversible error here. Whether or not the written bank-depositor agreement was modified by an executed oral agreement is irrelevant in light of the instant facts. Al-

---

[1] It is contended that the oral modification or course of dealing was established not to modify who could sign GSI's checks but rather to take care of those exceptional instances where GSI's checks were issued not in accordance with the terms of the written agreement.

though B/A may have agreed that the check, not signed in accordance with the written instructions, would be paid and not returned by B/A unless B/A was specifically instructed to do so, B/A Officer Provenza initially returned the check to Camino bank "just to be on the safe side." Provenza's action was contrary to the terms of the alleged modified agreement and in apparent ignorance of that agreement's existence. Therefore, whatever oral modification there may have been was not knowingly complied with by B/A. For this reason alone, it is immaterial whether the court failed to make specific findings on the existence or nonexistence of the oral modification. Consequently, section 634 does not preclude this court from resolving all factual matters in favor of the prevailing party and in support of the judgment. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].)

Accordingly, in resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party and in support of the judgment. All issues of credibility are likewise within the province of the trier of fact. All conflicts, therefore, must be resolved in favor of the respondent. (*Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d at p. 925; *Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 346 [282 P.2d 23, 51 A.L.R.2d 107]; *Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We conclude that based upon the entire record, and in view of the conflicting evidence, substantial evidence exists to support the trial court's determination that the written deposit contract was not orally modified.

RATIFICATION

Inasmuch as the events in the present case occurred before the effective date of the amendment, it appears appropriate and fair to assume that the former provision is controlling here. In 1975, section 1698 of the Civil Code provided: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

California Uniform Commercial Code section 1103 essentially provides that unless displaced by the particular provisions of the Commercial Code, the principles of law and equity including the law relative to estoppel, fraud, bankruptcy, or other validating or invalidating cause shall supplement its provisions. The effect thereof is to keep viable other existing rights.

■ By definition, ratification is the approval or sanctioning of some deed or act. ■ Appellant argues that there was a ratification by respondent, and that the court should find that GSI ratified the check in question. In

support thereof, appellant submits that: Provenza contacted Reed and inquired as to whether the check was to be returned; Reed informed Provenza that the check was valid and was not to be returned; ratification was made with full knowledge of all relevant facts; Reed was authorized by GSI to ratify or approve questionable checks and such ratification was effective at the time made and cannot be revoked; and the ratification caused the authority which was thereby given to Reed and Goldstein to sign the check in question to relate back to the time that the check was executed; or, in the alternative, the ratification caused the authority which was thereby given to B/A to pay the check to relate back to the time of the actual payment thereof.

The trial court found that neither GSI nor any authorized representative on its behalf ratified the bank's payment. In support thereof, in part, respondent cites the bank's own witnesses who testified that neither Maslansky nor Haines (whose signature was required on a check exceeding $10,000) ever ratified payment. Haines was not authorized to ratify payment after he resigned from GSI on February 23. Moreover, Haines specifically refused to ratify payment of the check when asked to do so by Provenza.

Becoming quite basic, the first inquiry relates to the authority of Reed to make the check initially or to ratify its payment thereafter. The evidence established that the deposit contract did not authorize Reed to draw checks exceeding $10,000 without the signature of Maslansky or Haines. Reed was not a corporate officer. The course of dealing showed that although Reed may have been the first person Provenza consulted regarding an improper check, such a check was always approved or signed personally by Haines or Maslansky. Provenza stated that Haines never told him that Reed was authorized to approve the checks. Therefore, it defies logic to assert that one whose signature was not sufficient to make the check effective in the first place could ratify the validity of a check exceeding $10,000.

The record reflects that substantial evidence supports the trial court's determination that no authorized officer of GSI ratified the payment; and therefore the court concludes there was not any ratification on the part of GSI.

## ESTOPPEL

Appellant contends that GSI is estopped from asserting the bank's lack of authority to pay the $250,000 check, and urges in support thereof, both the Commercial Code and common law estoppel.

California Uniform Commercial Code section 3406 provides in part that any person who by negligence substantially contributes to a material alter-

ation or the making of an unauthorized signature is precluded from asserting the lack of authority against a drawee who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's business.

Appellant further asserts that GSI was negligent and argues if the signature on the check is unauthorized, such was the direct result of the negligence of GSI; that negligence is evident from the very execution and delivery to Commopts of the check in question by Goldstein and Reed; that the deliberate act of GSI in issuing the check was not really through mere negligence but by design; and that the conduct of GSI was not mere negligence but even gross negligence.

Respondent asserts that the California Uniform Commercial Code section 3406 is a detriment rather than a benefit to appellant and requires that the drawee act in accordance with reasonable commercial standards.

Provenza testified that the number of improperly signed checks amounted to between one and two per week for a total of not more than twelve; and that the isolated occurrences hardly evidence any contributory negligence on the part of GSI. Further, it is argued by respondent that such infrequent mistakes were contemplated by the parties and that is why GSI was paying B/A for handling improperly signed checks.

By its own admission, B/A had assumed the risk of final payment prior to obtaining any purported approval or ratification. The B/A decided to let the midnight deadline pass before inspecting the check. Its passage was by the bank's own deliberate action in failing to forward the check to its branch office in a timely manner for inspection as was its usual practice.

B/A offered no evidence bearing on the issue of reasonable commercial standards of the drawee's business. Also, reasonable commercial standards would not have permitted B/A to administer the high volume GSI corporate checking account on the basis of an alleged uncertain oral understanding which directly contradicted the written deposit contract.

An appellate court's review is limited to determining whether there is any substantial evidence contradicted or uncontradicted which will support the conclusion reached by the trial court. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 808 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].)

This court concludes that there was substantial evidence which supports the trial court's conclusion No. 27 that "neither plaintiff nor GSI are estopped to bring this action or recover herein against B/A."

## Subrogation and Unjust Enrichment

California Uniform Commercial Code section 4407 provides in part that if a payor bank has paid an item under circumstances giving a basis for objection by the drawer to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights (a) of any holder in due course on the item against the drawer, and (b) of the payee of the item against the drawer either on the item or under the transaction out of which the item arose.

The purpose of this section is that under appropriate factual circumstances, the cited section gives the bank remedies to make itself whole. Therefore, based upon the Commercial Code and common law, the bank asserts that it is entitled to full subrogation rights of Camino bank and Commopts.

In this case, however, the appropriate factual circumstances are not present. B/A is not entitled to subrogation under either section 4407 or common law.

*Siegel* v. *New England Merchants Nat. Bank* (1982) 386 Mass. 672 [437 N.E.2d 218], cited by B/A as an illustration of the scope of section 4407, is not applicable. The *Siegel* court was concerned with the rights of the bank and its depositor in the situation where the bank paid a *valid* but postdated check prior to the check's maturity. Section 4407 was applicable in that instance to prevent the depositor from acquiring and retaining the double benefit of having the bank's premature payment discharge the depositor's legal obligation while also allowing the depositor to recover from the bank that same debt already paid. (*Id.,* at p. 221.)

In the case at bench, the attempted discharge of GSI's alleged debt to Commopts was without proper authority and thus a nullity. There was no showing made by B/A at the time of trial that would sustain any loss by payment of the check. To the contrary, the bank prevailed on its cross-complaint against individual cross-defendants, each of whom is primarily responsible on the check. Further, GSI's estate will not be unjustly enriched if it recovers the amount of the check plus interest from B/A. B/A cannot point to any benefit which would be retained by GSI, its customers or trade creditors, as a result of this attempted payment to Commopts in perpetration of fraud as found by the bankruptcy court. As the bankruptcy court pointed out in subordinating the claims of Commopts and other brokers, "a sufficient reason for subordinating a claim may be simply the violation of the rules of fair play and good conscience by the claimant. The court believes that the claims for commissions filed by salesmen and brokers should be

subordinated to the claims of all other creditors. Otherwise to permit these claimants to profit by their sales would be unjustly enriching such claimant at the expense of a luckless investor to whom he sold a worthless document.''

The trial court determined that there was no unjust enrichment. This court concludes that there is sufficient and substantial evidence to support the trial court's findings.

## HOLDER IN DUE COURSE

B/A asserts that both Camino bank and Commopts are "holders in due course" with rights against GSI, and that the bank is subrogated to those rights.[2] Commopts was not entitled to payment for sales commissions because it never actually sold options, it merely made paper trades. Likewise, there was a failure on the part of B/A to meet its burden to prove that Commopts gave ''value.''

The bankruptcy court found Commopts, GSI's agent, was an active participant in GSI's fraudulent scheme. Commopts could not claim any good faith in the receipt of the money it knew to be the proceeds of fraud. The president of Commopts and the witness upon whom the bank relies in establishing Commopts' good faith testified about the frauds jointly perpetrated by Commopts and GSI. Any indication by the president that he had no concern that the check might not be paid reflects only his anticipation of the continued success of the fraudulent scheme and not Commopts' good faith in receiving the check. California Uniform Commercial Code section 1201, subdivision (20) defines a "holder" essentially to mean a person who is in possession of an instrument drawn, issued or indorsed to him or to his order or to bearer in blank. To be a holder the party must have possession of an instrument which is "drawn" as heretofore defined.

California Uniform Commercial Code section 3102, subdivision (1)(e) defines "instrument" as a negotiable instrument. Section 3104, subdivision (1)(a) states that a negotiable instrument must "be signed by the maker or drawer.''

The evidence was that the check was never effectively signed. Therefore, Commopts never had any right against GSI on the check and the check was not a "negotiable instrument" from the time of its making.

---

[2]Section 3302, subdivision (1) of the California Uniform Commercial Code states:
"(1) A holder in due course is a holder who takes the instrument
"(a) For value; and
"(b) In good faith; and
"(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

The same evidence would tend to disqualify Camino bank as a holder in due course. B/A argues that Camino bank acquired a security interest in the check for Camino bank and in effect gave value because Commopts withdrew the credit given. Here B/A concedes Camino bank was not obligated to credit Commopts' account before the "midnight deadline." ■ By crediting Commopts' account before the midnight deadline had passed, Camino bank was not acting in good faith with respect to the instrument.

## TRUSTEE'S DEFENSES

California Uniform Commercial Code section 3305, subdivision (2)(b) provides that a holder in due course remains subject to such incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity.

The draftsman of the code explained California Uniform Commercial Code section 3305, subdivision (2)(b) as establishing that if under local law the effect is to render the obligation of the instrument entirely null and void, the defense may be asserted against the holder in due course. ■ Thus, even a holder in due course may not recover where the underlying debt was illegal, unenforceable and otherwise null and void. (Cal. Code Comment, West's Ann. Com. Code (1964) foll. § 3304, [¶] 5, pp. 214, 215.)

Two trial courts have found that GSI's entire business operation constituted a scheme to defraud its customers, and that an integral part of GSI's scheme involved Commopts' brokers and agents. A fraudulent scheme was perpetrated upon the public. (Cf. *C. I. T. Corporation* v. *Panac* (1944) 25 Cal.2d 547, 550 [154 Cal.Rptr. 710, 160 A.L.R. 1285].)

B/A argues that the trial court did not make a finding of illegality.[3] Code of Civil Procedure section 632 basically requires the trial court to issue a "statement of decision" explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial.

The trial court, in conclusion No. 16, specifically found that the check was not used to pay a *valid* outstanding obligation of the depositor GSI. A reasonable inference therefrom is that what was paid was for an *invalid* use and purpose. Such a finding in those words certainly leaves no doubt but that the trial court concluded that the transaction was illegal and invalid.

In support of the defense of illegality, the following evidence was presented:

---

[3]B/A points to the fact that GSI and Commopts stipulated to a debt owed. It is fundamental, however, that this stipulation, when viewed in light of the dubious validity of the debt and transactions, is not binding on the court.

1. The bankruptcy court found that although GSI, through its brokers, sold approximately 175,000 options, it attempted to deliver commodities in only four instances and purchased a futures contract on behalf of only one customer.

2. GSI never had the financial ability to pay customers the profits from the customers' purchase of options from GSI without selling additional options to new customers.

3. The brokers and salesmen, including Commopts, were integral parts in GSI's scheme to defraud its customers which included the distribution of false advertising materials and brochures.

4. That the brokers sold a worthless document to the customers.

5. Commopts was not merely a part of the scheme, but was GSI's agent.

6. Since no actual sales occurred, Commopts did not earn any commissions.

All in all, it appeared without question that another "ponzi scheme" was created and when it became difficult to raise money, the entire "ponzi" pyramid collapsed.

This court concludes that there was substantial evidence which would indicate that the transaction was illegal, invalid and unenforceable.

### NEGLIGENCE

Respondent's second cause of action was pleaded within the framework of common law negligence. Appellant argues that there are principles and rules of law set forth in the Commercial Code which are dispositive of this case and articulate a loss distributive scheme that applies to the facts before the court. To recognize that the Commercial Code has displaced the common law in this area would serve to further such code purposes and would aid in making the law uniform among the various jurisdictions. (See Cal. U. Com. Code, § 1102, subd. (2)(c).)

Although there is much to be gained by having a codified set of rules, it would appear that California Uniform Commercial Code section 1102, subdivision (3) in essence does not displace the use of "good faith, diligence, reasonableness and care" prescribed by the code. In other words, it means that in the application of the codified rules, people are still to deal with each other in good faith and a reasonable manner.

In *Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d 801, the Supreme Court did not have any difficulty in concluding that defendant's failure to require the signatures of both executors on withdrawing funds from the decedent estate "fell below the standard of care owed to the estate." (*Id.,* at p. 811.) The *Bullis* court further found that appellant breached its common law duty to act with reasonable care when it permitted Lampe to withdraw funds from the estate account without Booth's signature. (*Id.,* at pp. 812-813.)

In *Bullis,* evidence of the custom and practice in the banking industry of the number of signatures required for co-executors to withdraw funds from an estate checking account was presented at trial. Testimony as to the practice of some of the state's largest banks and numerous local banks in the Los Angeles area was presented. In each case the testimony was that the banks required two signatures to withdraw funds. (*Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 809.)

■ The standard of care required in a particular circumstance may be based on a statute or the custom and practice in the relevant community. (See *Perumean* v. *Wills* (1937) 8 Cal.2d 578, 583 [67 P.2d 96]; see also 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 498, pp. 2764-2765; and *Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 809.)

■ Whether the failure to exercise reasonable and ordinary care is to be based on provisions of the Commercial Code referring to the use of ordinary care, or whether the rules re common law negligence independently prevail, need not be decided in this case. Regardless of the nomenclature, and the specific provisions of the Commercial Code, negligence was shown by the conduct of B/A. The hope of making commercial transactions more uniform across the country can hardly be said to relieve banks of a duty of reasonable care toward their depositors.

CONCLUSION

The trial court's determination that the bank breached its duties to GSI by honoring the improperly signed check is supported by substantial evidence. It is not clear whether or not the terms of the deposit contract were modified orally or in writing. Any modification that may have resulted was of no apparent concern, for B/A acted in a manner which implies a lack of knowledge of the alleged modified terms. Substantial evidence supports the finding that there were no such modifications. Likewise, there was neither any ratification, estoppel, subrogation nor unjust enrichment. If the bank followed its normal procedures, the B/A local office would have seen the check in time to note the deficient signature and return the check to Camino

before the midnight deadline passed. "But for" the bank's wrongful payment, the additional sum of $250,000 would be available for disbursement by the GSI's estate to *valid creditors,* and Commopts would never have received the $250,000 which B/A gratuitously paid.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 18, 1984.