FUNDACION MUSEO DE ARTE CONTEMPORANEO DE CARACAS—SOFIA IMBER, Plaintiff,

v.

CBI–TDB UNION BANCAIRE PRIVEE and Republic National Bank of New York, Defendants.

No. 93 Civ. 6870(PKL).

United States District Court,
S.D. New York.

March 4, 1998.

Allegaert Berger & Vogel L.L.P., New York City, Michael S. Vogel, of counsel, Arent Fox Kintner Plotkin & Kahn, New York City, Janine M. Gargiulo, of counsel, Bainbridge & Straus, L.L.P., Birmingham, AL, Michael Straus, of counsel, for plaintiff.

Kronish, Lieb, Weiner & Hellman L.L.P., New York City, Celia Goldwag Barenholtz, of counsel, Stephen A. Wieder, of counsel, Cindi R. Brandt, of counsel, for Defendant Republic National Bank of New York.

LeBoeuf, Lamb, Greene & MacRae L.L.P., New York City, John S. Kinzey, of counsel, James E. Schwartz, of counsel, for Defendant CBI–TDB Union Bancaire Privee.

## OPINION AND ORDER

LEISURE, District Judge.

A two-week bench trial was held in September, 1997, in this diversity action for paying on an unauthorized signature, money had and received, conversion, and aiding and abetting a theft. Based on the following findings of fact and conclusions of law, the Court holds that neither defendant is liable to plaintiff for the proceeds of the unauthorized check that lies at the heart of this action.

## FINDINGS OF FACT

### Background

1. Plaintiff Fundacion Museo de Arte Contemporaneo de Caracas—Sofia Imber (the "Museum") is a not-for-profit contemporary art museum, organized under the laws of Venezuela, located in Caracas, Venezuela. Ms. Sofia Imber served as Director of the Museum at all times relevant to this action.

2. Defendant CBI–TDB Union Bancaire Privee ("UBP") is a banking organization headquartered in Geneva, Switzerland. UBP has maintained a representative office in New York City at all times relevant to this action. UBP's business consists of providing investment and money management services to wealthy individuals and institutions. UF 50.[1]

3. Defendant Republic National Bank of New York ("Republic") is a national banking association organized under the laws of the United States, with its principal place of business in New York City.

4. This action centers around a check in the amount of $825,000 bearing the pre-printed number 177 and dated May 7, 1993 ("Check 177"). Check 177 was drawn on the Museum's account at Republic and was made payable to UBP. UF 4. While Check 177 purports to bear the signature of Sofia Imber, she did not actually sign the check; her signature on the face of Check 177 was forged. UF 56.

5. On May 10, 1993, Gustavo de los Reyes, a Venezuelan national, sent Check 177 to UBP's New York office for deposit. UF 55. Republic paid on Check 177 on May 14, 1993, and thereupon debited the Museum's account in the amount of $825,000. UF 76. On or about May 17, 1993, UBP wire-transferred $815,000 of the proceeds of Check 177 in accordance with Reyes's instructions. UF 77. The funds have not been recovered. The Museum has demanded that UBP and Republic repay the proceeds of Check 177, plus interest, but neither defendant has repaid. UF 142, 143.

*The Museum's Republic Account*

6. In 1981, the Museum opened a checking account with Republic. UF 7. This account was closed and the proceeds transferred to an Insured Money Director Account, or money market account, which was opened by Republic on behalf of the Museum in or about April, 1987. UF 16.

7. In the period between February of 1987 and June of 1993, it was Republic's policy to keep on file signature cards with samples of the signatures of the signatories on money market accounts maintained at Republic. The signature card for the Museum's account at Republic (PX 35)[2] was in Republic's files during the period from on or about April 14, 1988, until July of 1994. The card bears an original specimen of Imber's signature and indicates that Imber was the sole signatory on the account. UF 21.

8. The Museum's account at Republic was managed in New York by Republic's international private banking unit. Mercedes Hess initially served as the account officer for the Museum, and Keith Kindler replaced her following Hess's promotion. In addition, Republic maintained a representative office in Caracas from which Republic employees, including Rosangela Febres, assisted the Museum.

9. On April 8, 1988, Imber executed an account agreement for the Museum's account at Republic. DX 2, 2–A. The account agreement provided that the Museum accepted and agreed to all the terms and conditions contained therein, including that the Museum

> will exercise reasonable care and promptness in examining such statement [of accounts] and items to discover any irregularity including, but not limited to, any unauthorized signature or alteration and will notify the Bank promptly in writing of any such discovery, and in no event more than fifteen (15) calendar days subsequent to the time that such statement and items were first mailed or available to the [Museum].

DX 2 at 5.

10. Republic issued an updated version of its account agreement in September of 1991, superseding the agreement executed in April

---

**1.** Citations to the uncontested facts enumerated in the Pre–Trial Order are indicated by "UF" followed by the paragraph number used in the Pretrial Order. Citations to the trial transcript are indicated by a "T" followed by the relevant page and line numbers, and citations to deposition testimony are indicated by the witness's name followed by the applicable page and line reference.

**2.** Defendants' exhibits are referred to as "DX" followed by the applicable number, plaintiff's exhibits as "PX", and court exhibits as "EX".

of 1988. In addition to extending the response period for notification of any irregularity contained in an account statement to thirty days, the updated account agreement provided:

a) "[M]ail addressed and mailed to you at your address of record with the Bank shall be deemed to be properly delivered." DX 4 at 1;

b) "You shall keep your checks and all records and correspondence relating to your account(s) with us in a safe and secure place. If any of your checks are lost or stolen, you must promptly notify the Bank in writing of such loss or theft." *Id.* at 6.

*The Museum's Care of the Relevant Checkbooks*

11. Republic ordered four new checkbooks for the Museum, each containing ten checks, in early April of 1993. These checks were numbered 141–180. The blank check numbered 177 was located in the last of these checkbooks. UF 35. Republic verified that Check 177 was in the checkbook prior to its being sealed and delivered to the Museum. EX K. A Museum employee retrieved the checkbooks from Republic's Caracas office in or about April, 1993, and delivered them to Eglee Guilarte Machado ("Guilarte"), the secretary of the Museum's administration department. Guilarte placed the checks in a safe in the office of Virginia Da Silva Frade ("Da Silva"), an accountant in the Museum's administration department. UF 37, 38. Neither Guilarte nor Da Silva counted the checks before placing them in the safe, though Guilarte understood that she was supposed to do so. Guilarte 45:23–46:06. Based on the foregoing, the Court concludes that Check 177 was stolen after the Museum had taken possession of it from Republic.

12. Guilarte stated that as a matter of Museum policy, all newly-arrived checks were turned over to her. She admitted that "if I am not at my desk for any reason when these checkbooks come in, they are left there (on the desk) just the same." DX 67–T.

13. Prior to mid-May of 1993, the Museum had no written procedures concerning the receipt, safekeeping, and custody of its blank checks. Prior to May 10, 1993, the Museum kept its blank checks in the safe in Da Silva's office. The safe had two locks; one opened with a key and the other was a combination lock. The combination lock often was kept unlocked during the day. The key to the other lock was kept in a metal closet in Da Silva's office. The key to that closet was kept in Da Silva's desk drawer, which was not kept locked. UF 39. There was no restriction of access to Da Silva's office during the period when Check 177 likely was stolen. The Museum did not conduct an inventory of its blank checks between August of 1991 and May of 1993, and did not maintain a list of its blank checks. EX G.

14. Based on the foregoing, the Court concludes that the Museum's procedures concerning the receipt and storage of its blank checks during the period in which Check 177 was stolen from the Museum allowed many opportunities for unauthorized access to the checks. It is likely that these deficiencies substantially contributed to the theft of Check 177.

*The First Banco Latino Check*

15. On May 5, 1993, the Museum learned that an unauthorized check in the amount of nine million bolivars (valued at approximately $104,167 at that time) had been presented on its Banco Latino account in Venezuela. UF 40. The Banco Latino check did not cause a loss to the Museum because Banco Latino identified the check as unauthorized and did not pay on it, despite the fact that it purported to bear the signatures of the two authorized signatories on the Museum's Banco Latino Account. UF 41, 42.

16. The Banco Latino check had been kept in the same safe as were the checks on the Museum's account at Republic. UF 43. Despite this, the Museum did not notify Republic of the attempt to pass the forged Banco Latino check. UF 44.

17. Republic offered uncontradicted expert testimony that an ordinary banking institution would want to know that a check had been stolen from a client, even if the check had been issued by a different bank. Also, Republic's expert testified that there existed in 1993 various tactics that Republic could have employed to bolster the security

of a Republic account if it had known of such a theft. T 810:1–25. As Republic was not informed of the theft of the Banco Latino check, Republic did not initiate any of these procedures before paying on Check 177 a week later. Based on the foregoing, the Court concludes that if the Museum had informed Republic of the failed attempt to pass the forged Banco Latino check, Republic would have employed security measures that likely would have prevented it from paying on Check 177. Thus, the Museum's negligent failure to inform Republic of the forged Banco Latino check substantially contributed to the loss of the proceeds of Check 177.

18. As a result of the Banco Latino check, Adolfo Javier Pacheco Mercado ("Pacheco"), then the Museum's controller, conducted an inventory of the Museum's blank checks on Friday, May 7, 1993. This inventory was not verified by any other Museum employee. UF 47. The inventory discovered no other missing checks. However, the surrounding circumstances indicate that the inventory was unreliable. As an initial matter, Da Silva signed the inventory under duress; when she expressed to Pacheco a reluctance to sign without first having counted the blank checks herself, he threatened that if she did not sign immediately, he would tell her superiors that she had tried to prevent the making of the inventory. Da Silva 34:7–20. Moreover, a second check was missing on May 7 from the same Banco Latino checkbook, but was not discovered as missing until the second check was presented for payment (unsuccessfully) three months later. UF 103. Finally, Check 177 was in route to New York on Monday, May 10, 1993 (UF 55); it is highly unlikely that Check 177 actually was in the Museum's safe at the time of the inventory late on Friday afternoon, May 7. A thorough inventory, then, likely would have alerted the Museum that Check 177 had been stolen prior to its being presented to Republic for payment. The Museum then could have notified Republic about the theft, and Republic would not have paid on Check 177.

*Rangel's Responsibilities at the Museum*

19. Ana Teresa Rangel Acosta ("Rangel") served as the Museum's Chief Administrator (her title, in Spanish, was "Gerente"). Rangel 8:10–22. In this position, her responsibilities "were of a rather large scope. Everything that had to do with expenses, expenditures in general. To review and to make sure that there was, that all the expenditures made were correct ...." Rangel 14:2–6. She also executed the Museum's budget. T 59:2–18. While Imber served as the Museum's Director, and therefore bore ultimate responsibility for the Museum's finances, it is the Court's impression based on Rangel's deposition testimony and the Court's observation of the whole of Imber's trial testimony that Imber delegated broad authority to Rangel to handle fiscal matters. It became obvious that Imber is a very important participant in all aspects of the cultural world of Venezuela and elsewhere. Imber engaged in a myriad of activities, including acquiring art for the Museum, hosting television and radio programs in Venezuela, editing and writing cultural articles for a major Venezuelan newspaper, and serving on the "consulting boards" of museums across Latin America and the world. T 274:13–16; 275:5–277:1. Thus, Imber decided to delegate control of the day-to-day handling of the Museum's finances to Rangel. As Imber noted, "I don't know in which way or how Ana Teresa Rangel works or goes about her work. I know the results of her work." Imber 165:21–24.

20. Imber admitted that Rangel was responsible for communicating with the banks at which the Museum maintained accounts. T 299:2–15. Republic's dealings with the Museum confirmed that Rangel was the person whom Republic's employees should contact with any questions concerning the Museum's account at Republic. For instance:

a) Hess testified that she tried to speak with Imber via telephone on a number of occasions, but always was transferred to Rangel. T 707:23–708:8. Hess also spoke with Rangel on those occasions when Imber's signature on a check or payment order on the Museum's Republic account had been questioned by a verifier. T 708:15–709:5. Finally, when Hess tried to meet with Imber during a 1992 trip to Venezuela, Imber directed Hess to meet with Rangel instead. T

702:24–704:12. Hess met with Rangel at the Museum on June 18, 1992. UF 30; T 704:13–705:7; DX 43.

b) Kindler, who succeeded Hess as the account officer assigned to the Museum's account at Republic, never spoke about the account with anyone at the Museum other than Rangel. T 589:22–25; 554:9–10. He listed Rangel as his contact at the Museum. EX B; T 590:1–592:14. On March 2, 1993, Kindler also visited the Museum on a business trip to Venezuela. UF 32, DX 44. While he made an appointment to meet with Imber, Kindler was directed to meet with Rangel upon his arrival at the Museum. T 556:14–557:21.

c) Febres, who worked in Republic's Caracas office as a liaison between the New York office and Venezuelan clients, also stated that Rangel "was the person with whom I had to get in touch at the Museum regarding any information about the account." T 501:25–502:2. In explaining why she called Rangel rather than Imber in order to confirm the signature on Check 177, Febres stated, "Mrs. Rangel was the person with whom we dealt at the Museum. We never had any contact with Mrs. Imber with regard to the account with us." T 545:24–546:1.

21. Based on the foregoing, the Court concludes that it was reasonable for Republic to assume that while Imber was the sole authorized signatory on the Museum's account, Rangel was the proper person to contact concerning the confirmation of Imber's signature on a check. The Museum held Rangel out as the contact person for the Republic account and shielded Imber from contact with Republic at every turn. Rangel had access to all of the Museum's financial information, and had confirmed checks or payment orders on previous occasions.

*Republic's Payment of Check 177*

22. In 1993, checks presented to Republic through the clearing system arrived at Republic during the night. Early the next morning, signatures on checks that were drawn on accounts within the international private banking group were examined by a verifier in Republic's operations area. Two verifiers examined checks in excess of $10,000. If either verifier questioned the signa-

ture, the instrument was given to the account officer along with a copy of the signature card. The account officer could contact the account holder and determine whether the item should be paid. Republic's procedures permitted an account officer to approve payment of a check based on the oral verification of the account holder. UF 69. Republic has presented uncontradicted expert testimony, which the Court finds credible, that these procedures were consistent with those utilized by other banks, and in some respects more stringent than other banks' procedures. T 803:20–22.

23. Republic received Check 177 through the clearing system on May 13, 1993. UF 70. Natividad Alvaro, a Republic verifier, questioned the signature on Check 177 during the morning of May 14, 1993. UF 71. This was not the first instance that Imber's signature had been questioned by a Republic verifier. T 656:12–18; 728:1–6.

24. Republic's telephone records show that a call lasting four minutes and thirty-one seconds was placed from Kindler's extension at Republic to the Museum on May 14, 1993, at 11:50 A.M. PX 7, UF 72. Imber was not present at the Museum on May 14, because she was traveling abroad; Rangel was present at the Museum that day. UF 73, 75. There is no evidence indicating that anyone from Republic attempted to contact Imber on May 14.

25. The Court concludes that during the course of his phone call to Rangel on May 14, Kindler conveyed all material information concerning Check 177 to Rangel, including that the signature on the check had been questioned. While Rangel denies speaking with Kindler at all, the Court concludes that she mistakenly confirmed Check 177 as a legitimate expenditure for the purchase of art. The Court's conclusion is based on:

a) Kindler's testimony, which the Court finds credible. T 578:22–579:15; 644:2–645:25; 686:14–687:12;

b) a note in Kindler's handwriting on the face of Check 177 stating "sig ok" and "kk", denoting Kindler's initials. PX 1;

c) a contemporaneous note in Kindler's handwriting on a copy of Check 177, stating "telcon A. Rangel". PX 2, 3; and

d) an unease with Rangel's credibility, engendered by some of her statements at her deposition. These include her failure to acknowledge having spoken with Kindler at all on May 14, 1993, and her failure to admit to having met with Kindler at the Museum a few months earlier, despite conclusive evidence contradicting her version of both these occurrences.

26. Because Kindler initially had difficulty getting through to the Museum via telephone from New York, he requested that Febres contact Rangel from Caracas to confirm the signature on Check 177. T 507:21–508:20; 577:4–578:21. Febres also spoke with Rangel via telephone on May 14. The Court finds that Rangel again mistakenly confirmed Check 177 to Febres as an expenditure for the purchase of art. T 508:6–509:16.

*The Museum's Discovery that Check 177 was Unauthorized*

27. On or before June 10, 1993, Republic mailed to the Museum a statement of account for the month of May 1993, reflecting the May 1993 closing balance in the Museum's account, including the debit entry relating to Check 177. UF 95. On or before July 16, 1993, Republic mailed to the Museum a statement of account for the month of June 1993, reflecting the May 1993 closing balance less debts incurred during June of 1993. UF 96.

28. Account statements for the Republic account were mailed by Republic to the Museum via ordinary surface mail, in envelopes bearing the return address: "P.O. Box 321, Grand Central Station, New York, New York 10018." Republic's name did not appear on the outside of the envelope. UF 98.

29. Republic was aware that the Venezuelan mail system sometimes is slow and that Republic's account statements sometimes were delayed. The Museum never requested, and Republic never suggested, that its statements routinely be sent by any means other than ordinary mail. Prior to May 1993, the Museum occasionally wrote to Republic, at times by facsimile, requesting copies of the Museum's account statements when they were late. UF 99.

30. Documents produced by the Museum indicate that on a number of occasions, the Museum's employees reconciled on the same day Republic account statements for different months. For instance, the statements from January and February of 1991 were reconciled on March 31, 1991; the statements from January and March of 1992 were reconciled on May 21, 1992; and the statements from January, February, and March of 1993 were reconciled on May 21, 1993. UF 124.

31. The Museum reconciled its Republic account statements for May and June of 1993 on August 16, 1993. UF 124.

32. Various Museum employees testified to a backlog in the Museum's accounting department in the summer of 1993. For instance, Castillo Ramirez Tibisay Thais, a Museum employee who served as Assistant to the Accountant, stated that the May account statement was not reconciled until August "[b]ecause I had a lot of work." EX I–T at 12th. Da Silva added that the reconciliation of the May statement was not performed until August "[b]ecause there was a change in the accounting system and a staff change, and this delayed the work, which caused a backlog." EX F–T at 15th. Pacheco confirmed that the delay in reconciliation was caused by a backlog in accounting. EX G–T at 25th.

33. In early August of 1993, the Museum learned that a second unauthorized check had been presented on its Banco Latino account. UF 101, DX 109. This second forged Banco Latino check prompted the Museum to conduct an inventory of its blank checks on August 13, 1993. This inventory was conducted by Urbano Emilio Ramos Trujillo, who had replaced Pacheco as the Museum's controller. As a result of the inventory on August 13, the Museum discovered that Check 177 was missing. UF 105.

34. The Museum examined its May 1993 Republic account statement for the first time on August 13, 1993, following the completion of the inventory. UF 106. The Museum then requested from Republic a copy of Check 177. UF 107.

35. After the Museum reconciled its Republic statements for May and June of 1993, the Museum formally notified Republic of the Museum's position that Check 177 was unauthorized. The Museum did so via a fax dated August 16, 1993, which Republic received on August 17, 1993. UF 109.

36. After the discovery that Check 177 had been forged and paid on, an employee in the Museum's accounting department stamped dates of receipt on the Museum's copies of its account statements from Republic for January through May of 1993. The employee stamped a date three days prior to the date the account statement in question was reconciled, based on the belief that the Museum normally reconciled a statement within three days of its receipt. Thus, as it was reconciled on August 16, the May 1993 statement bears a received stamp of August 13, 1993. The employee who performed this date-stamping did not have personal knowledge of the date the statements were received, and the Museum does not maintain records that show the date on which the statement actually was received. UF 123. The Court concludes that this date stamp is not probative of the true date of receipt of the May 1993 account statement.

37. Based on the testimony of the Museum's employees concerning a backlog in the Museum's accounting department in 1993, the Museum's apparent history of failing to reconcile its Republic statements promptly, and the fact that the June statement already was available to the Museum on August 16, 1993, when it reconciled the May statement, the Court concludes that the Museum received the May statement from Republic well before August of 1993. Of course, the Court cannot point to a specific date of receipt, as there is no evidence in the record to fix such a date. It is clear that receipt occurred after mid-June, as Republic did not mail the statement prior to June 10.

38. There is no evidence before the Court suggesting that Republic might have recovered the proceeds of Check 177 if the Museum had reconciled its May 1993 account statement before July 10, 1993, as required under the account agreement. While Republic complains that it lost the opportunity to trace and recover the proceeds of Check 177, Republic has presented no credible evidence supporting a conclusion that it likely would have recovered the proceeds of the forged instrument had Republic been notified on July 10, 1993, as opposed to August 16, 1993, that the Museum considered Check 177 unauthorized. The Court thus concludes that Republic has failed to demonstrate that the Museum's failure to reconcile its May 1993 account statement until August 16, 1993, substantially contributed to the loss of the proceeds of Check 177.

*Republic's Fees and Expenses*

39. The account agreement governing the Museum's account with Republic contains the following provision:

[Y]ou agree to pay on demand all losses, costs and expenses (including without limitation fees and expenses of counsel), if any, incurred by the Bank in connection with or relating to your account ... sustained as a result of ... (b) any claim, notice or legal process served or made by a third party, whether legally enforceable or not, to or against or relating to any of your accounts with the Bank, including where the Bank elects to seek resolution of such claim by instituting legal action ....

DX 4 at 19.

40. This action involves claims made by the Museum against Republic and UBP. It does not involve a claim made by a third party relating to the Museum's account at Republic. Therefore, the Museum cannot be liable to Republic under the account agreement for Republic's fees and expenses relating to this action.

*Gustavo de los Reyes's UBP Account*

41. On or about April 20, 1988, at the request of Alain Saman, UBP'S Deputy Representative in New York, Gustavo de los Reyes opened an account with UBP in Switzerland (account # 531200)(the "de los Reyes account"). UF 51. Reyes was a friend of Saman's. Saman 19:6–9. Reyes was one of the first clients Saman introduced to UBP. T 108:22–25. Saman believed that Reyes was a member of a wealthy family in Venezuela with cattle ranching interests, and that Reyes participated in the family business of

raising cattle. Saman 19:19–20:18. However, Saman had no personal knowledge of Reyes's net worth. T 110:19–24.

42. During the period from September 30, 1988, through April 30, 1993, there was only one deposit of new funds into the de los Reyes account: a transfer of $80,000 on November 28, 1991, which Reyes had caused to be wired from his account at Glendale Federal Bank into UBP's account at Chase Manhattan Bank, N.A. ("Chase"), for further credit to the de los Reyes account. In addition, Reyes transferred funds within his UBP account during this period. UF 127.

43. Over the course of five years, Reyes emptied his account at UBP; by the beginning of May of 1993, there was an overdraft of $304 in the de los Reyes account. UF 126, 128.

44. The balance of the de los Reyes account at the close of business on May 13, 1993, was $824,695, equal to the amount of the proceeds of Check 177 minus the previous $304 overdraft. UF 130. The balance was reduced to $9657 by the close of business on May 18, 1993, as UBP disbursed the bulk of the funds in accordance with Reyes's instructions (described, *infra*). UF 131.

45. The balance of the de los Reyes account at the close of business on July 22, 1993, was $669,075, following the deposit of the proceeds of five Citibank checks whose total face value was $664,481. UF 133. The balance was reduced to $1796 by the close of business on August 12, 1993, as UBP again disbursed most of the available funds in accordance with Reyes's instructions (again described, *infra*). UF 134, 135.

*UBP'S Cashing of Check 177 and Disbursal of the Proceeds*

46. From time to time, including during 1993, Reyes informed Saman that he intended to deliver a check or checks to UBP for (i) deposit; and (ii) prompt disbursement of funds out of the account. UF 53. "A couple" of months before depositing Check 177 with UBP, Reyes asked Saman how long it would take to disburse the proceeds of a "substantial" check after it was deposited with UBP. Saman 41:18–43:13.

47. On May 10, 1993, Reyes sent Check 177 by DHL courier from Venezuela to Saman in New York for deposit. UF 53. The face of Check 177 bore one signature, which purported to be the signature of Imber but was not in fact her signature. UF 56. Check 177 was payable to UBP. EX 200. Apart from this fact, Check 177 did not state how its proceeds should be dealt with when UBP received it. UF 57.

48. Saman was not in the United States when Check 177 arrived at UBP. T 126:15–19. He returned to the United States on May 17, 1993. T 128:8–16.

49. The Museum never maintained any account at UBP, and owed no debt to UBP. UF 63, 64. Nonetheless, before cashing the check, UBP made no inquiry of the Museum as to the purpose for which the Museum might have issued Check 177 to UBP. UF 63.

50. It was not unusual for UBP to receive checks for deposit. Nor was it unusual for UBP to receive for deposit in customer accounts checks that were payable to the order of UBP. T 194:19–24.

51. On or about May 12, 1993, UBP hand-delivered Check 177 to Chase for deposit into UBP'S account at Chase. UF 60. Chase credited $825,000 to UBP's account that day. UF 65.

52. UBP would not have accepted Check 177 as it was presented had it not been for Saman's personal relationship with Reyes. T 142:23–144:13.

53. On May 10, 1993, Reyes sent a facsimile to Saman instructing UBP to (1) deposit Check 177 into the de los Reyes account; (2) disburse $725,000 of the proceeds by wire transfer to the account of Nutralac 30, S.A., with Banco Federal in Caracas (the "Nutralac account"); and (3) disburse $90,000 of the proceeds by wire transfer to the joint account of Reyes and Maria Reyes with Consolidated Bank in Florida (the "Consolidated account"). UF 58.

54. Pursuant to Reyes's instructions, UBP credited the de los Reyes account in the amount of $825,000, with a value date of May 13, 1993. UF 66. On or about May 17, 1993, UBP wire-transferred $725,000 to the Nutra-

lac account and $90,000 to the Consolidated account. UF 77.

55. By the time that Saman saw Reyes's instructions upon Saman's return to the United States, most of the proceeds of Check 177 had been disbursed. T 135:12–14. Saman called Reyes in Venezuela to express his surprise that so little of the proceeds was to remain with UBP. Previously, Saman had understood that Reyes was going to withdraw no more than half of the proceeds of the "substantial" deposit Reyes had mentioned. T 219:9–12. Saman was informed that the funds were to be used to pay off debts on the Reyes family's farming operations. T 137:9–14. Saman then told Reyes that UBP would not accept such a transaction in the future because UBP was an investment bank and not a commercial bank. T 137:5–7.

*Subsequent Events*

56. On or about July 22, 1993, five cashiers checks, totaling $664,481.76, were presented to Chase. These checks (the "Citibank checks"), were drawn on Citibank, N.A. It appeared on the Citibank checks that their drawer was Banco Exterior, C.A., a Venezuelan bank with an office in Caracas. UF 84. The checks were made out to different individuals. UF 85. None of the checks was made payable to UBP. However, an indorsement on each of the Citibank checks stated that the proceeds of the check should be deposited into the account that UBP maintained at Chase. UF 85. Reyes previously had been aware of UBP's account number at Chase. UF 86.

57. On July 26, 1993, Reyes sent Saman a facsimile stating that the Citibank checks had been deposited into UBP's Chase account. The facsimile requested that Saman instruct UBP's main office in Geneva to disburse $667,201.30 to six separate accounts as soon as the deposits to the de los Reyes account were confirmed. UF 87.

58. Saman sent Reyes a facsimile transmission concerning Check 177 and the Citibank checks on July 28, 1993, at the request of Maurice de Picciotto, head of UBP's New York Representative Office. UF 89. The facsimile stated:

Dear Gustavo:

This will confirm our telephone conversation of a few minutes ago, in which I expressed to you, as an old friend, my surprise in the way you are handling your açount [*sic*] with us.

Our Bank will not be in a position to accept this sort of "Passage Account"; we are an investment bank and we have acquired through many years of hard work, a very good reputation, which we intend to keep.

A) On May 7, 1993 US$825,000. was deposited in your account, on May 10, 1993 we received instructions to send out the money in two transfers minus US$10,000.– which remained in our Bank.

B) On July 22, 1993 without any knowledge, somebody deposited on our account at Chase, checks totalling [*sic*] US$664,- 481.57 you then advised us by fax on July 26, 1993 of these deposits that were intended to your account and at the same time you gave us instructions to transfer 6 different amounts totalling US$667,201.30 I do not think that point A or B need further explanation. I will be [v]ery happy to continue working with you in investing your money or your family or your friends money, but what you have done in particular on point B is totally inacceptable [*sic*] and I ask you not to do it again.... P.S. You must understand that the transfer instructions of the money on point B will not be done until we are assured that the checks are good and that our Bank will not be liable in case the checks are returned unpaid.

EX 203.

59. UBP's main office complied with Reyes's request (as modified on August 3) concerning the disbursal of the proceeds of the Citibank checks. On August 5 and August 9, 1993, UBP debited the de los Reyes account the amount of the requested transfers. UF 92.

60. The Citibank Checks were forgeries. UF 111. However, no one ever has sued UBP to recover the proceeds of the Citibank Checks. UF 94.

61. On or about August 16, 1993, UBP became aware of the Museum's allegation

that Check 177 was unauthorized. UBP received in its Caracas office a copy of the letter sent from Imber to Republic notifying Republic of the Museum's allegation. T 229:14–18.

62. On or about August 18, 1993, Saman flew to Venezuela and met with Reyes. T 229:7–25. The Court concludes that UBP and Saman had determined that it was likely that Check 177 was unauthorized when Saman traveled to Venezuela. Saman 77:22–78:2. Based on Saman's testimony at trial, his deposition testimony, and its observation of Saman as he testified at trial, the Court reaches the following conclusions:

a) A main purpose of Saman's trip was to obtain from Reyes a waiver of Swiss banking secrecy. T 230:14–17. Saman obtained this waiver. DX 131.

b) However, Saman also wanted to confront Reyes personally in order to determine for himself whether Reyes was involved in any wrongdoing. T 233:21–24.

c) Finally, Saman intended to warn Reyes that the parties involved suspected malfeasance concerning Check 177. T 231:18–21; Saman 86:2–9. The Court determines that Saman did not intend such a warning to serve as a "heads-up" alerting Reyes that he ought to cover his tracks so as to evade law enforcement. Rather, based on an assessment of the credibility and demeanor of the witness, the Court concludes that Saman had the far less nefarious intention of letting Reyes know that the scheme had been uncovered in hopes of convincing Reyes to agree to repay the proceeds and/or cooperate with any investigation. Saman 82:10–21. The Court believes that this was a misguided but well-intentioned attempt to encourage a quick and relatively easy resolution of the problems presented once it came to light that it was likely that Check 177 was unauthorized.

63. Despite his misgivings concerning Reyes's involvement with Check 177, Saman did not notify law enforcement authorities to discuss the matter upon his return to New York. T 236:24–237:5. On October 7, 1993, Agent Michael Brooks of the FBI requested that UBP provide Reyes's address and telephone number. T 441:18–442:1. UBP sent the FBI a facsimile with the requested information on October 13, 1993. DX 129. The FBI made no additional requests of UBP in connection with this matter. T 443:8–11.

*The Nature of UBP's Actions Concerning this Matter*

64. In mid-May of 1993, the circumstances surrounding the deposit and disbursal of the proceeds of Check 177 should have been somewhat suspicious to UBP. The mere facts that UBP was the payee of Check 177 and that UBP had not had any prior dealings with the Museum, in and of themselves, need not have alerted UBP to the potential for malfeasance. However, the immediate disbursal of the proceeds of Check 177 was inconsistent with UBP's normal function as an investment bank, and Reyes's earlier inquiries of Saman as to the speed with which such a disbursal could be effected should have indicated to Saman that Reyes might have been up to no good. Nonetheless, there is no evidence that UBP had any knowledge at the time of the transactions of any illegal scheme concerning Check 177. In hindsight, UBP could have conducted itself more prudently, but the Court concludes that UBP neither knew nor knowingly disregarded a conscious risk that Check 177 was unauthorized.

65. When Reyes deposited and disbursed the proceeds of the Citibank checks in July and August of 1993, on the other hand, UBP was aware of the suspicious circumstances surrounding the transactions. This is evidenced by the references in Saman's letter to UBP's good reputation, as well as the specific warning that UBP would not disburse the proceeds unless it was assured that the Citibank checks were good. *See, supra,* at ¶ 58. The Court concludes that UBP's suspicions were aroused by the fact that, twice in a short period of time, Reyes had used his UBP account in a manner inconsistent with an investment account. As it was the repetitive nature of this second set of transactions that made UBP suspicious, these suspicions are not probative of UBP's state of mind in handling Check 177 (since Check 177 came first).

66. UBP was not aware of any illegal scheme to gain the proceeds of Check 177, and in no way sought to promote any such scheme. The Court notes that there never has been any indication of what motive UBP might have had to aid such a scheme.

## CONCLUSIONS OF LAW

### I. *The Museum and Republic*

#### A. *The Museum's Claim under U.C.C. § 3–404(1)*

67. The Museum clearly has established a *prima facie* case against Republic under U.C.C. § 3–404(1), which states:

> Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

N.Y. U.C.C. § 3–404(1)(McKinney 1991 and Supp.1997–98). As explained, *supra,* there is no dispute that Republic was the drawee of Check 177, Republic paid on Check 177, Republic thereupon debited the Museum's account in the amount of $825,000, and the signature on Check 177 was unauthorized. Therefore, the Museum has established a *prima facie* case under § 3–404(1), and the remaining issues surrounding this claim concern the various defenses asserted by Republic.

#### B. *Republic's Defenses*

##### 1. *Ratification*

68. The Court has concluded that Rangel confirmed Check 177 as an expenditure for the purchase of art. *See, supra,* at ¶¶ 25–26.

69. Though Imber was the sole authorized signatory on the Republic account, Rangel had actual authority to ratify Check 177. Therefore, her confirmation of Check 177 binds the Museum.

70. The parties do not dispute that New York's substantive law applies in this diversity action. As defined under New York law:

> [A]ctual authority may be either express or implied. Implied authority has been considered to be actual authority given implicitly by a principal to his agent. The term has also been defined as a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers.

*King World Productions v. Financial News Network, Inc.,* 660 F.Supp. 1381, 1383 (S.D.N.Y.1987) (Weinfeld, J.) (internal quotations omitted).

71. Under New York law, one need not be an authorized signatory on an account in order to possess the authority to ratify a signature on a check drawn on that account. *See Latallo Establissement v. Morgan Guaranty Trust Co.,* 155 A.D.2d 214, 553 N.Y.S.2d 686 (1st Dept.1990). In *Latallo,* the court found that an attorney without signing authority on the plaintiff's account had ratified a forged signature transferring funds from the account. *See id.* 553 N.Y.S.2d at 687–89.[3] The Court recognizes that the holding in *Latallo* (that one need not be an authorized signatory in order to ratify a signature) stands in contrast with the conclusions reached by courts in other jurisdictions that have considered the question. *See, e.g., Twellman v. Lindell Trust Co.,* 534 S.W.2d 83, 92 (Mo.Ct.App.1976); *Danning v. Bank of America Nat'l Trust & Sav. Ass'n,* 151 Cal.App.3d 961, 974, 199 Cal.Rptr. 163 (1984). Nonetheless, sitting in diversity, the Court must apply the substantive law of New York as would a New York state court. Therefore, relying on *Latallo,* the Court finds that Rangel had authority to ratify Check 177 even though she was not an authorized signatory on the Museum's account at Republic.

72. Even assuming that Republic failed to establish that Rangel had actual

---

**3.** The bizarre facts of *Latallo* involve a son who was an authorized signatory on the account in question but forged the signature of his mother, who also was an authorized signatory. The court clearly indicated that ratification of the son's signatures by the mother's lawyer, who was not an authorized signatory on the account, served as adequate and independent grounds for validating the transactions at issue. *See Latallo* at 689.

authority to confirm Check 177, she possessed apparent authority to do so.

■ 73. Under New York law:

Apparent authority is the application of the doctrine of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he or she may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his [or her] authority and changed his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.

*See King World* at 1385 (quoting *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 664–65 (2d Cir.1964)). So long as the principal's words and conduct make it reasonable to believe that an agent has authority to take certain action, a third party relying on that reasonable belief need not inquire further; the principal will be bound by its agent. *See King World* at 1385.

74. The Museum held Rangel out to Republic as the contact person for all issues concerning the Museum's account with Republic, including the confirmation of questioned signatures. *See, supra,* at ¶¶ 20–21. In paying on Check 177, Republic reasonably relied on the belief that Rangel possessed the authority to confirm questioned signatures of Imber's. Therefore, the Museum is estopped to deny that Rangel's actions in confirming Check 177 were not authorized.

75. As the Museum ratified Check 177, the Museum cannot claim against Republic under § 3–404(1) for the proceeds of the check.

### 2. *The Museum's Negligence*

76. Under U.C.C. § 3–406:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

N.Y. U.C.C. § 3–406 (McKinney 1991 and Supp.1997–98).

■ 77. Republic paid on Check 177 in good faith and in accordance with reasonable commercial standards. *See, supra,* at ¶¶ 23–26.

■ 78. The Museum's negligence in safeguarding, maintaining, and controlling its blank checks substantially contributed to the making of the unauthorized Check 177. *See, supra,* at ¶ 14. The Museum's negligence in failing to advise Republic of the first Banco Latino forgery also substantially contributed to the making of Check 177. *See, supra,* at ¶ 17.

79. Therefore, under § 3–406, the Museum is precluded from asserting a claim against Republic for damages suffered in connection with Check 177.

### 3. *The Museum's Duty Under U.C.C. § 4–406*

80. Under U.C.C. § 4–406:

(1) when a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or ... otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on an item if the bank also establishes that it suffered a loss by reason of such failure ....

N.Y. U.C.C. § 4–406 (McKinney 1991 and Supp.1997–98).

■ 81. Republic has not established that the Museum failed to examine its account statement with reasonable care and promptness, because it is not clear when the

Museum received its account statement for May, 1993. *See, supra,* at ¶¶ 27–37.

82. Even assuming that the Museum had failed to examine the statement from May of 1993 with reasonable promptness, Republic has not demonstrated that it suffered a loss by reason of such failure. *See, supra,* at ¶ 38.

83. Therefore, Republic's asserted defense under § 4–406 is without merit.

#### 4. *The Account Agreement*

##### a) *Failure to Report the Unauthorized Check Within 30 Days*

■ 84. Under the Terms and Conditions of the account agreement governing the Museum's account at Republic, the Museum had a duty to report any unauthorized signature within thirty days after Republic mailed to the Museum an account statement listing the irregular transaction. *See, supra,* at ¶¶ 9–10. While Republic mailed the Museum's account statement for May of 1993 on or before June 10, 1993, the Museum did not notify Republic that Check 177 was unauthorized until August 16, 1993. *See, supra,* at ¶ 35.

85. The U.C.C. sets a period of one year as the default standard for determining whether a customer's examination of its bank statement is reasonably prompt. *See* N.Y. U.C.C. § 4–406(4) (McKinney 1991 and Supp. 1997–98). However, this provision may be varied by agreement so long as the substituted standard is not manifestly unreasonable. *See* N.Y. U.C.C. §§ 1–102(3), 4–103(1) (McKinney 1991 and Supp.1997–98).

86. Though both parties knew that the Venezuelan mail delivery system was unreliable, *see, supra,* at ¶ 29, their agreement that the Museum had to notify Republic of any irregularities in an account statement within thirty days of the mailing of that statement was not manifestly unreasonable. *See P.T.A. Pub. Sch. 72 v. Mfrs. Hanover Tr.,* 138 Misc.2d 289, 524 N.Y.S.2d 336, 340 (Civ.Ct. 1988) (enforcing provision requiring depositor to notify bank of any forgery within fourteen days of mailing of account statement, despite fact that statement was stolen); *see also Stowell v. Cloquet Co-op Credit Union,* 557 N.W.2d 567, 571–72 and n. 1 (Minn. 1997). While it might seem more fair for the Court to impose a requirement that the thirty days for notification run from receipt rather than mailing, especially given chronic postal delays, this would require that banks send all correspondence to customers via certified mail in order to prove receipt. The Court will not substitute its judgment for the parties' determination that such a requirement was unnecessary; at the very least, the terms of the account agreement were not manifestly unreasonable. *See PTA Pub. Sch. 72* at 340 and n. 5. Therefore, the Court must enforce the account agreement and find that the Museum's failure to notify Republic of the irregularity in the May 1993 account statement within thirty days of the mailing of that statement bars the Museum from recovering for payment on the unauthorized Check 177.

##### b) *Failure to Notify Republic of the Stolen Banco Latino Check*

■ 87. The Museum did not notify Republic when the Museum discovered on May 5, 1993, that someone had attempted to pass a forged check drawn on the Museum's Banco Latino account. *See, supra,* at ¶ 16. Republic's claim that this failure constituted a violation of the account agreement is without merit, because under the relevant provision of the account agreement, the Museum had a duty to notify Republic only of the theft of checks on the Republic account. *See, supra,* at ¶ 10(b).

### C. *Republic's Counterclaim*

88. Republic's counterclaim for fees and expenses is denied, for the reasons stated, *supra,* at ¶¶ 39–40.

## II. *The Museum and UBP*

### A. *Money Had and Received*

#### 1. *Northern Trust*

■ 89. The Museum asserts a claim against UBP under the doctrine of money had and received. The Court of Appeals of New York has explained:

> In an action for money had and received, the plaintiff must show that it is against good conscience for the defendant to keep

the money. Though it may be termed an action at law, it is, of course, founded upon equitable principles aimed at achieving justice, unimpeded by legal niceties.

*Federal Ins. Co. v. Groveland State Bank,* 37 N.Y.2d 252, 372 N.Y.S.2d 18, 21–22, 333 N.E.2d 334 (1975) (internal quotation omitted).

90. Despite UBP's countless protestations to the contrary during the course of this litigation, the Museum's claim under this doctrine is not barred by the decision in *Northern Trust Co. v. Chase Manhattan Bank, N.A.,* 582 F.Supp. 1380 (S.D.N.Y.), *aff'd,* 748 F.2d 803 (2d Cir.1984). In *Northern Trust,* the Court balanced the equities of the particular case before it and found, based on the totality of the circumstances, that the drawee/drawer of a forged check could not recover the proceeds of the forged check from a payee that had distributed them in accordance with the instructions in a forged accompanying letter. *See Northern Trust* at 1384–85. *Northern Trust* stands for the proposition that courts must balance the equities in determining whether an action for money had and received can proceed against the payee of a forgery; in no way does *Northern Trust* mandate that such a payee never can be found liable for money had and received. Thus, *Northern Trust* does not preclude the Museum's claim against UBP for money had and received.

### 2. *The Final Payment Rule*

91. Under U.C.C. § 3–418, "[P]ayment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." N.Y. U.C.C. § 3–418 (McKinney 1991 and Supp.1997–98).

92. Moreover, under U.C.C. § 3–302:

(1) A holder in due course is a holder who takes the instrument

  (a) for value; and

  (b) in good faith; and

  (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

(2) A payee may be a holder in due course.

N.Y. U.C.C. § 3–302 (McKinney 1991 and Supp.1997–98).

93. UBP took Check 177 for value, depositing the check into UBP's Chase account and then disbursing the proceeds of Check 177 in accordance with Reyes's instructions. *See, supra,* at ¶¶ 51, 54.

94. Despite the somewhat suspicious circumstances surrounding Reyes's deposit of Check 177 with UBP and his instructions concerning the disbursal of its proceeds, *see, supra,* at ¶¶ 46–55, UBP took Check 177 in good faith and without notice of any defense against it. Good faith is defined in the U.C.C. as honesty in fact in the conduct or transaction concerned. *See* N.Y. U.C.C. § 1–201(19) (McKinney 1991 and Supp.1997–98). The Court of Appeals for the Second Circuit has instructed:

> In evaluating a party's good faith, "the inquiry is what [the holder] actually knew." If a holder "did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith [is] sufficiently shown."

*A.I. Trade Finance, Inc., v. Laminaciones de Lesaca, S.A.,* 41 F.3d 830, 837 (2d Cir.1994) (Kearse, J.) (quoting *Chemical Bank v. Haskell,* 51 N.Y.2d 85, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339 (1980)). UBP did not have actual knowledge that Check 177 was a forgery. *See, supra,* at ¶ 64. Therefore, its actions with regard to Check 177 were in good faith under the applicable U.C.C. definition.

95. An equivalent standard governs the question of whether UBP took Check 177 with notice of a claim or defense against it. As Judge Kearse explained in *A.I. Trade:*

> In determining whether a party had notice, the New York Court of Appeals has held that ... the UCC [] requires application of "a subjective test of actual knowledge rather than an objective test which might involve constructive knowledge. Holders in due course are to be determined by the simple test of what they actually knew, not by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances."

41 F.3d at 837 (quoting *Hartford Accident & Indemnity Co. v. American Express Co.*, 74 N.Y.2d 153, 544 N.Y.S.2d 573, 578, 542 N.E.2d 1090 (1989)). Under this standard, UBP had no notice of any defense against Check 177 because it had no actual knowledge of any such defense. Accordingly, UBP is entitled to protection as a holder in due course under U.C.C. §§ 3–305 and 3–418.

### 3. *The Museum's Negligence*

■ 96. The Museum's negligence substantially contributed to the loss of the proceeds of Check 177. *See, supra,* at ¶¶ 14, 17.

97. Even if UBP were not protected under U.C.C. §§ 3–302 and 3–418, UBP would be not be liable for money had and received because it could not be against good consideration to allow a holder in due course, as opposed to a party whose negligence substantially contributed to the forgery, to keep the disputed money. *See Hartford Accident & Indem. v. American Exp.,* 136 Misc.2d 62, 518 N.Y.S.2d 93; *see also Groveland,* 372 N.Y.S.2d at 22, 333 N.E.2d 334 (depositor's negligence in examining monthly bank statement bars recovery for money had and received) (citing *Arrow Bldrs. Supply Corp. v. Royal Nat. Bank,* 21 N.Y.2d 428, 288 N.Y.S.2d 609, 612, 235 N.E.2d 756 (1968)). Therefore, based on the totality of the circumstances in the instant case, the Museum's negligence would preclude its recovery from UBP for money had and received.

### B. *Conversion*

■ 98. As the Second Circuit recently reiterated, "Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *Lopresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir.1997). Wrongful intent is not an element of a conversion claim. *See id.* at 42. The Museum asserts a claim against UBP for conversion of the proceeds of Check 177.

■ 99. As UBP was a holder in due course, the Museum's conversion claim must fail. *See Hartford Accident,* 518 N.Y.S.2d at 95 ("Whether Defendants were holders in due course of the checks taking free of all defenses is concededly the dispositive issue between the parties. If the answer is affirmative, they could not be liable for any tortious conduct and the cause[] of action for ... conversion would fail."); *see also* N.Y. U.C.C. §§ 3–305, 3–418 (McKinney 1991 and Supp. 1997–98). Thus, as UBP was a holder in due course, it cannot be found liable for conversion.

### C. *Aiding and Abetting*

■ 100. Finally, the Museum asserts a claim against UBP for aiding and abetting the theft of the proceeds of Check 177. The Restatement Second of Torts states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other ....

RESTATEMENT (SECOND) OF TORTS § 876(b) (1977). Furthermore:

> New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge.

*Kolbeck v. LIT America, Inc.* 939 F.Supp. 240, 246 (S.D.N.Y.1996)(Mukasey, J.).

101. The Court has concluded that UBP did not have actual knowledge that Check 177 was part of any scheme to defraud the Museum. *See, supra,* at ¶ 64. Thus, UBP cannot be held liable for aiding and abetting the theft of the proceeds of Check 177.

### CONCLUSION

For the reasons stated in this Opinion, neither defendant is liable to plaintiff in connection with the loss of the proceeds of Check 177.

**SO ORDERED.**