MERCANTILE BANK of Arkansas *v.* John G. VOWELL

CA 02-839                                             117 S.W.3d 603

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered June 11, 2003

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *Randy L. Grice* and *Traci LaCerra*, for appellant.

No response.

JOHN F. STROUD, JR., Chief Judge. This appeal arose from a civil judgment of $6,014.38 in the circuit court of Pulaski County in favor of appellee and against appellant, Mercantile Bank of Arkansas and its successor entity, Firstar Bank. Appellant argues (1) that the trial court erred in finding that the conduct of appellee, Dr. John G. Vowell, did not substantially contribute to forgeries and unauthorized transactions by his daughter, Suzan Vowell, and that, as a result, appellee was not precluded from asserting the forgeries and unauthorized transactions against appellant pursuant to Ark. Code Ann. § 4-3-406; (2) that the trial court further erred in applying the allocation and preclusion provisions of Ark. Code Ann. § 4-4-406(e); and, finally, (3) that the trial court erred in apportioning the loss between appellee and appellant pursuant to the customer-account agreements. Appellee chose not to file a brief in response. We hold that there is no clear error in the trial court's finding that Dr. Vowell's conduct did not substantially contribute to the forgeries and unauthorized transactions. Neither do we find clear error in the trial court's finding that the appellant bank did not fail to exercise ordinary care. Where we do find error, however, is in the trial court's determination of which items appellee is precluded from recovering from appellant and the trial court's allocation of the loss between appellant and appellee. We therefore affirm in part and reverse and remand in part so that the trial court can enter a new judgment in accordance with this opinion.

Appellee and his wife, now deceased, had an interest-bearing checking account and a savings/money-market account with appellant. Both appellee and his wife signed the customer-

account agreements with respect to each account. Each agreement contained a provision immediately above the signature line, which provided:

> SIGNATURE(S) — THE UNDERSIGNED AGREE(S) TO THE TERMS STATED ON THE FRONT AND BACK OF THIS FORM, AND ACKNOWLEDGE(S) RECEIPT OF A COMPLETED COPY ON TODAY'S DATE. THE UNDERSIGNED ALSO ACKNOWLEDGE(S) RECEIPT OF A COPY OF OUR ACCOUNT INFORMATION BROCHURE[.]

The agreements also contained the following provision:

> **STATEMENTS** — You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized payments or alterations, you must promptly notify us of the relevant facts. If you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we exercised ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items forged or altered by the same wrongdoer. You agree that the time you have to examine your statement and report to us will depend on the circumstances, but that such time will not, in any circumstance, exceed a total of 30 days from when the statement is first made available to you.
>
> You further agree that if you fail to report any unauthorized signatures, alterations, forgeries or any other errors in your account within 60 days of when we make the statement available, you cannot assert a claim against us on any items in that statement, and the loss will be entirely yours. This 60 day limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

Appellant's policy regarding bank statements is to mail monthly bank statements on any account that has deposit or withdrawal activity. The bank statement covers the previous month's activity for the time frame that appears on the statement. The statements were usually sent to the account holder two days after the cutoff day listed on the statement and were generally considered as

received two days thereafter. Appellee received bank statements at the Little Rock, Arkansas, address provided in the customer-account agreements. Appellee testified at trial that his wife had been responsible for reviewing the bank statements and balancing the checkbooks. Appellee did not personally review the accounts.

In June of 1997, appellee and his wife allowed their daughter, Suzan Vowell, now also deceased, and her boyfriend to move in with them at their home. At that time, they knew that Suzan and her boyfriend had been involved with drugs, alcohol, writing bad checks, and stealing. They also knew that Suzan had stolen checks from them in the past and forged either appellee's or his wife's signatures. The trial court found that appellee and his wife took precautions against future theft and forgeries by Suzan by hiding Mrs. Vowell's purse, which contained their checkbook, under the kitchen sink. Furthermore, appellee's wife suffered from diabetes mellitus and alcoholism, conditions that forced her to stay in bed either all or most of the time. Appellee, however, continued to rely on his wife to review the bank statements and to balance the checkbooks.

Beginning in June 1997 and continuing into September 1997, Suzan forged appellee's wife's signature on forty-two checks, drawn on both accounts, and committed nine unauthorized ATM withdrawals in the aggregate amount of $12,028.75.[1] Suzan found her mother's purse hidden under the kitchen sink and stole the checkbooks and ATM card from the purse. She apparently had access to, or figured out, appellee's PIN (personal identification number) because the number was identical with appellee's home security-system code. Suzan also stole certain credit cards, which she used to conduct various unauthorized transactions, but they did not involve appellant.

The first unauthorized banking transaction appeared on the June 1997 bank statement for the checking account, covering trans-

---

[1] Judge Roaf's dissenting opinion mentions a federal statute that pertains to electronic-fund transfers, including ATM transactions, 15 U.S.C. § 1693 *et seq.* The applicability of this statute and the manner in which it affects this case were not raised before the trial court by either party below nor were they raised to this court on appeal. With no Arkansas appellate cases construing this statute and without the benefit of argument from counsel for the parties involved in this case, we decline to address the issue.

actions occurring June 6 through July 7, 1997. This statement was sent to appellee on July 9, 1997. The trial court found that the statement was therefore deemed received as of July 11, 1997. This statement contained unauthorized payments totaling $230.00.

The second set of unauthorized transactions appeared on the July 1997 bank statement for the checking account, covering transactions occurring July 8 through August 6, 1997. That statement was mailed on August 8, 1997, and was thus deemed received as of August 10, 1997. This statement contained unauthorized payments totaling $1,235.25.

The third set of unauthorized transactions also appeared on the July 1997 bank statement for the savings account, covering transactions occurring July 23 through August 21, 1997, which was sent on August 23, 1997, and was deemed received as of August 25, 1997.[2] This statement contained unauthorized payments totaling $5,140.00.

The fourth set of unauthorized transactions appeared on the August 1997 bank statement for the checking account, covering transactions occurring August 7 through September 7, 1997. That statement was mailed to appellee on September 9, 1997, and was deemed received as of September 11, 1997. This statement contained unauthorized payments totaling $1,423.50.

Finally, the fifth set of unauthorized transactions appeared on the August 1997 bank statement for the savings account, covering transactions occurring August 22 through September 22, 1997. This statement was sent on September 24, 1997, and was deemed received as of September 26, 1997. It contained unauthorized payments totaling $4,000.00. The trial court specifically found that appellee did not notify appellant of the unauthorized transactions appearing on the June and July checking-account statements within thirty days from the date each was either sent or deemed received. Finally, on September 15, 1997, appellee discovered a receipt for an

---

[2] The trial court notes in its findings of fact that the July 1997 bank statement for the savings account was sent out on August 23, 1997, and "deemed received as of September 11, 1997." This must be a clerical error, inadvertently also picked up by appellant in its brief. Pursuant to the stated policy, the trial court deemed statements as received two days after they were sent to the customer, which would have been August 25, 1997.

unauthorized credit-card transaction and notified appellant about his discovery at a meeting with Bill Eldridge, branch manager of appellant's Geyer Springs branch. Immediately, appellant froze appellee's and his wife's accounts, alerted its tellers and computer system, and began investigating the alleged forgeries and other unauthorized transactions pursuant to its policy.

As a result of the alert on appellee's account, Suzan was arrested on September 16, 1997, after she attempted to obtain an unauthorized cash advance at appellant's Riverfront branch. No more unauthorized transactions occurred after the alert was issued. Appellant prepared eight separate "Forged or Altered Check Affidavits of Loss," setting forth the forty-two forged checks and nine unauthorized ATM withdrawals. Appellee's wife signed the affidavits and Bill Eldridge notarized her signature on each affidavit.

Based on the facts before it, the trial court concluded that appellee and his wife "attempted to take proper precautions to safeguard their checkbooks, ATM cards and PIN" and that Dr. Vowell's conduct did not "substantially contribute to the forgeries and unauthorized transactions by Suzan Vowell which were paid in good faith by Firstar." Thus, the trial court determined that appellee was not precluded from asserting any of the forgeries and unauthorized transactions against appellant under Ark. Code Ann. § 4-3-406.

The trial court concluded, however, that appellee failed to exercise reasonable promptness in the examination and reporting of the forged checks and other unauthorized transactions on the June checking-account statement and the July checking-account statement. Therefore, the court found that appellee was precluded from asserting against appellant the forgeries contained on both of those checking-account statements. The trial court also found that appellee was entitled to an allocation of loss as between him and appellant. The trial court ordered appellant to pay $6,014.38, without going into any detailed explanation of how this allocation was calculated.[3]

The trial court further found that appellant had not failed to exercise ordinary care and that it did not substantially contribute

---

[3] We note that the trial court's order to appellant to pay $6,014.38 constitutes exactly one-half of the entire sum of Suzan Vowell's unauthorized bank transactions and forgeries.

to the losses. Specifically, the court found that appellee was precluded from asserting against appellant the unauthorized payments in the June 1997 checking statement totaling $230.00, as well as the payments contained in the July 1997 checking statement totaling $1,235.25. The court then held:

> As previously noted, the Court finds that the additional amount should be apportioned. Specifically, the Court finds that Dr. Vowell should be responsible for an additional $4,552.12 of the loss. Therefore, Dr. Vowell is entitled to recover from the defendant the total sum of $6,014.38.

From that order arises this appeal.

### Arkansas Code Annotated section 4-3-406

Appellant first argues that the trial court (1) erred in finding that appellee's conduct did not substantially contribute to the forgeries and unauthorized transactions, and (2) therefore erred in concluding that appellee was not precluded from asserting the forgeries and unauthorized transactions against appellant pursuant to Arkansas Code Annotated section 4-3-406. We find no error and affirm.

We review findings of fact by determining whether the findings are clearly erroneous, or clearly against the preponderance of the evidence. *Knight v. Day*, 343 Ark. 402, 36 S.W.3d 300 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *City of Van Buren v. Smith*, 345 Ark. 313, 46 S.W.3d 527 (2001).

Our state uses a version of the applicable Uniform Commercial Code section 3-406, as provided in Arkansas Code Annotated section 4-3-406 (Repl. 2001). It states:

> (a) *A person whose failure to exercise ordinary care substantially contributes* to an alteration of an instrument or *to the making of a forged signature on an instrument is precluded from asserting* the alteration or *the forgery against a person who, in good faith, pays the instrument* or takes it for value or for collection.

> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instru-

ment and that failure.substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

(c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

(Emphasis added.)

■ Here, the trial court concluded that appellee attempted to take proper precautions to safeguard the checkbooks, ATM cards, and PIN from their daughter, Suzan Vowell. We find no clear error in that factual determination. Consequently, we also find that the trial court did not err in concluding that appellee was not precluded from asserting the forgeries and unauthorized transactions against appellant pursuant to section 4-3-406 because the preclusion would only apply if appellee failed to exercise ordinary care that substantially contributed to the loss. Moreover, there could be no allocation of loss in this case under section 4-3-406 because it requires a lack of ordinary care by the customer and the bank, neither of which occurred here.

*Arkansas Code Annotated section 4-4-406(e)*

■ For its second point of appeal, appellant contends that the trial court erred in its application of Arkansas Code Annotated section 4-4-406(e). We agree and point out that, generally, section 4-3-406 applies to a customer's conduct before a forgery and section 4-4-406 applies to a customer's conduct after a forgery.

Distinct from the amount of unauthorized payments that appellee may assert against appellant bank under Arkansas Code Annotated section 4-4-406(d)(2), which will be discussed later, we must also analyze whether the trial court properly used the allocation of loss provision that is contained in Arkansas Code Annotated section 4-4-406(e). Section 4-4-406(e) provides:

(e) *If* subsection (d) applies and *the customer proves* that the *bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the*

*customer precluded and the bank asserting the preclusion* according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply.

(Emphasis added.)

██ ██  According to Arkansas Code Annotated section 4-4-406(e), if a bank customer can prove that the bank failed to exercise ordinary care in paying the forged item, even though the customer failed to exercise reasonable promptness in examining the bank statements, the loss is allocated between the bank and the customer according to the extent of the customer's failure to comply with the duties of § 4-4-406(c) and the bank's failure to exercise ordinary care in paying the item. In order to prove a bank's failure to exercise ordinary care, a customer must prove that the bank's conduct does not fall within the statutory definition of ordinary care, as found in Arkansas Code Annotated section 4-3-103(a)(7) (Repl. 2001):

> (7) "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or 4-4-101 *et seq.*

*See also* Ark. Code Ann. § 4-4-104(c) (Repl. 2001) (making definition in § 4-3-103(a)(7) applicable to chapter 4 of title 4); comment 4 of Uniform Commercial Code, Art. 4, § 4-406 (stating that the "definition of 'ordinary care' in Section 3-103 . . . rejects those authorities that hold, in effect, that failure to use sight examination is negligence as a matter of law" and that where a customer's failure to examine her bank statements has led to loss under subsection (d) of § 4-406 "a bank should not have to share that loss solely because it has adopted an automated collection or

payment procedure in order to deal with the great volume of items at a lower cost to all customers").

■ In the instant case, the trial court's findings contain no suggestion that appellant was negligent or otherwise failed to exercise ordinary care when it made the payments. To the contrary, the trial court specifically stated that the "Court does not find that Firstar failed to exercise ordinary care and that Firstar substantially contributed to the loss." For purposes of this issue, it is significant that appellant made its last payment pursuant to Suzan Vowell's unauthorized transactions and forgeries on September 4, 1997, eleven days before it received notification from appellee that there was a problem. Appellant could not have known that the transactions were the result of forgery or other unauthorized conduct. Subsection (e) requires proof that appellant failed to exercise ordinary care. Such proof was missing here, and therefore, we reverse the trial court's allocation of loss.

*Arkansas Code Annotated section 4-4-406(d)(2)*

■ The fact that appellant exercised ordinary care in paying the items presented to it does not resolve the question of whether appellee is precluded from asserting some or all of those items against appellant. Arkansas Code Annotated subsections 4-4-406(c) and (d) explain a customer's duties with respect to examining his or her bank statements and the consequences of failing to do so. They provide in relevant part:

> (c) If a bank sends or makes available a statement of account . . . , the customer must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because . . . a purported signature by or on behalf of the customer was not authorized. If, based on the statement . . . the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

(1) the customer's unauthorized signature or any altera-
tion on the item, if the bank also proves that it suffered a loss
by reason of the failure; and

(2) the customer's unauthorized signature . . . *by the
same wrongdoer on any other item paid in good faith by the bank if
the payment was made before the bank received notice from the cus-
tomer of the unauthorized signature . . . and after the customer had
been afforded a reasonable period of time, not exceeding thirty (30)
days, in which to examine the . . . statement of account and notify
the bank.*

(Emphasis added.) The revised commentaries to section 4-4-
406(d) offer further explanation:

2. Subsection (d) states the consequences of a failure by the cus-
tomer to perform its duty under subsection (c) to report an alter-
ation or the customer's unauthorized signature. Subsection
(d)(1) applies to the unauthorized payment of the item to which
the duty to report under subsection (c) applies. If the bank
proves that the customer "should reasonably have discovered the
unauthorized payment" and did not notify the bank, the cus-
tomer is precluded from asserting against the bank the alteration
or the customer's unauthorized signature if the bank proves that it
suffered a loss as a result of the failure of the customer to perform
its subsection (c) duty. Subsection (d)(2) applies to cases in which
the customer fails to report an unauthorized signature or altera-
tion with respect to an item in breach of the subsection (c) duty
and the bank subsequently pays other items of the customer with
respect to which there is an alteration or unauthorized signature
of the customer and the same wrongdoer is involved. If the pay-
ment of the subsequent items occurred after the customer has had
a reasonable time (not exceeding 30 days) to report with respect
to the first item and before the bank received notice of the unau-
thorized signature or alteration of the first item, the customer is
precluded from asserting the alteration or unauthorized signature
with respect to the subsequent items.

Code *Commentaries* at 300-01 (Repl. 1995) (internal cross-refer-
ences omitted).

Summaries of the unauthorized transactions shown on appel-
lee's bank statements were introduced as Exhibit A. We presume

that the information contained in Exhibit A is correct and therefore reproduce pertinent portions of that exhibit below:

### JUNE CHECKING STATEMENT (Deemed Rec'd 7/11/97)

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| 4331297996 | 2554 | 07/01/97 | 80.00 |
| | 2551 | 07/01/97 | 150.00 |
| | | TOTAL | 230.00 |

### JULY CHECKING STATEMENT (Deemed Rec'd 8/10/97)

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| 4331297996 | 2555 | 07/08/97 | 60.00 |
| | 2612 | 07/11/97 | 60.00 |
| | 2614 | 07/14/97 | 120.00 |
| | 2552 | 07/15/97 | 60.00 |
| | 2630 | 07/18/97 | 100.00 |
| | 2631 | 07/18/97 | 100.00 |
| | 2632 | 07/21/97 | 120.00 |
| | 2636 | 07/23/97 | 125.00 |
| | 2645 | 07/28/97 | 120.00 |
| | 2560 | 07/30/97 | 120.25 |
| | 2568 | 08/04/97 | 250.00 |
| | | TOTAL | 1,235.25 |

### JULY SAVINGS STATEMENT (Deemed Rec'd 8/25)

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| 4331269888 | 170 | 07/30/97 | 110.00 |
| | 171 | 07/30/97 | 200.00 |
| | 172 | 08/05/97 | 325.00 |
| | 173 | 08/07/97 | 320.00 |
| | 175 | 08/07/97 | 170.00 |
| | 176 | 08/08/97 | 240.00 |
| | 178 | 08/09/97 | 360.00 |
| | 177 | 08/11/97 | 325.00 |
| | 179 | 08/12/97 | 300.00 |
| | 181 | 08/13/97 | 350.00 |
| | 182 | 08/14/97 | 320.00 |

| | 183 | 08/15/97 | 300.00 |
|---|---|---|---|
| | 184 | 08/18/97 | 320.00 |
| | 186 | 08/18/97 | 400.00 |
| | 188 | 08/19/97 | 200.00 |
| | 187 | 08/19/97 | 400.00 |
| | 189 | 08/20/97 | 500.00 |
| | | TOTAL | 5,140.00 |

**AUGUST CHECKING STATEMENT (Deemed Rec'd 9/11/97)**

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| | 2578 | 08/18/97 | 20.00 |
| | ATM wtd/fee | 08/21/97 | 103.50 |
| | ATM wtd. | 08/23/97 | 200.00 |
| | ATM wtd. | 08/23/97 | 100.00 |
| | ATM wtd. | 08/24/97 | 100.00 |
| | ATM wtd. | 08/24/97 | 100.00 |
| | ATM wtd. | 08/24/97 | 100.00 |
| | ATM wtd. | 08/26/97 | 200.00 |
| | ATM wtd. | 08/28/97 | 200.00 |
| | ATM wtd. | 08/30/97 | 300.00 |
| | | TOTAL | 1,423.50 |

**AUGUST SAVINGS STATEMENT (Deemed Rec'd 9/26/97)**

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| 4331269888 | 190 | 08/22/97 | 400.00 |
| | 193 | 08/25/97 | 200.00 |
| | 192 | 08/25/97 | 400.00 |
| | 195 | 08/25/97 | 500.00 |
| | 196 | 08/26/97 | 400.00 |
| | 198 | 08/28/97 | 350.00 |
| | 199 | 08/29/97 | 400.00 |
| | 202 | 09/02/97 | 800.00 |
| | 203 | 09/03/97 | 150.00 |
| | 204 | 09/04/97 | 250.00 |
| | 205 | 09/04/97 | 150.00 |
| | | TOTAL | 4,000.00 |

■ Appellee is precluded from recovering on any of the items contained in the June and July checking account statements because of the thirty-day time limit contained in the customer-account agreement, which was quoted previously. According to the agreement, if the customer fails to examine his or her statement and notify the bank of any unauthorized transactions within thirty days of the date that the statement is deemed to be received, and the bank is not at fault, then the customer is precluded from recovery. The June checking account statement was deemed received on July 11, 1997, and thirty days after that date would have been August 10, 1997. The July checking account statement was deemed received on August 10, 1997, and thirty days after that date would have been September 9, 1997. Appellee did not notify the bank until September 15, 1997, which was outside the agreed-upon time limits.

■ The terms of the customer-account agreement do not preclude appellee from recovering on the items contained in the other three bank statements, *i.e.*, the July savings, the August checking, and the August savings statements, because the bank was notified before thirty days had elapsed following the deemed-receipt dates of those statements, to wit September 24, October 11, and October 26, 1997.

■ However, the preclusion provision of Arkansas Code Annotated section 4-4-406(d)(2) does affect the July savings, the August checking, and the August savings statements because "the same wrongdoer," Suzan Vowell, was involved in all of the unauthorized transactions contained in these statements. This section precludes appellee from recovering on any unauthorized transactions that occurred after August 10, 1997, which is thirty days from the deemed receipt-date of the first statement, *i.e.*, the June checking account statement. This totally precludes appellee's recovery under the August checking and the August savings statements. However, the July savings account statement contains seventeen items, some of which are precluded and some of which are not. The last ten items have transaction dates after August 10, 1997, and are therefore precluded. The first seven items, however, precede the August 10 date and are therefore not precluded:

**JULY SAVINGS STATEMENT (Deemed Rec'd 8/25)**

| Acct # | Check # | Transaction Date | Amount |
|---|---|---|---|
| 4331269888 | 170 | 07/30/97 | 110.00 |
| | 171 | 07/30/97 | 200.00 |
| | 172 | 08/05/97 | 325.00 |
| | 173 | 08/07/97 | 320.00 |
| | 175 | 08/07/97 | 170.00 |
| | 176 | 08/08/97 | 240.00 |
| | 178 | 08/09/97 | 360.00 |

These seven transactions total $1,725.

■ Allowing recovery for the items that the bank paid before August 10, 1997, but precluding recovery for those items that were paid after August 10 is in keeping with the purpose of section 4-4-406 as explained in the comments:

> 3. . . . The rule of subsection (d)(2) follows pre–Code case law that payment of an additional item or items bearing an unauthorized signature or alteration by the same wrongdoer is a loss suffered by the bank *traceable to the customer's failure to exercise reasonable care in examining the statement and notifying the bank of objections to it. One of the most serious consequences of failure of the customer to comply with the requirements of subsection (c) is the opportunity presented to the wrongdoer to repeat the misdeeds. Conversely, one of the best ways to keep down losses in this type of situation is for the customer to promptly examine the statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further items.* Hence, the rule of subsection (d)(2) is prescribed, and to avoid dispute a specific time limit, 30 days, is designated for cases to which the subsection applies. These considerations are not present if there are no losses resulting from the payment of additional items. In these circumstances, a reasonable period for the customer to comply with its duties under subsection (c) would depend on the circumstances and the subsection (d)(2) time limit should not be imported by analogy into subsection (c).

Code *Commentaries* at 298–99 (Repl. 1995) (internal cross-references omitted and emphasis added).

*Effect of the Customer-Account Agreements on Loss Apportionment*

Appellant alternatively argues that the trial court erred in apportioning the loss between appellee and appellant pursuant to the Customer-Account Agreements. Generally, Arkansas Code Annotated section 4-4-103 (Repl. 2001) permits certain changes from the requirements set forth in title 4, chapter 4 of the Arkansas Code by means of private agreements between banks and customers. However, in the instant case, we conclude that the language contained in the applicable provisions, quoted previously, does not substantially vary from the requirements under Arkansas Code Annotated section 4-4-406, but rather virtually tracks the statute's language. In addition, the trial court, when addressing that contractual argument below, expressly referred to its finding concerning the allocation of loss under Arkansas Code Annotated section 4-4-406(e), the one it had "previously noted." Therefore, we need not address this argument further because, as we have pointed out previously, we find no error in the trial court's findings of fact that appellee did not substantially contribute to the forgery, that appellant did not fail to use ordinary care in paying the forged items, and that appellee did fail to timely examine and report the forgeries reflected in the bank statements. Thus, there is no basis in this case for allocation under section 4-3-406, section 4-4-406, or the customer-account agreements.

Affirmed in part and reversed and remanded in part for entry of a judgment in the amount of $1,725.

Affirmed in part; reversed and remanded in part.

GLADWIN and BAKER, JJ., agree. GRIFFEN, J., concurs. NEAL and ROAF, JJ., dissent in part; concur in part.

WENDELL L. GRIFFEN, Judge, concurring. I concur, because I agree in the outcome of this case, but write separately to express that I would have found additional error in the trial court's analysis of Ark. Code Ann. § 4-3-406—incidentally, a matter quite distinct from our analysis under Ark. Code Ann. § 4-4-406(d)(2), with which I agree. Concerning the analysis under § 4-3-406, the trial court specifically found that appellee's conduct did not substantially contribute to the forgeries and unauthorized transactions even though the facts of the case, as

reflected in the trial court's findings, appear to suggest otherwise, as I shall explain below. Thus, I disagree with the majority's view that there were not enough facts for the trial court to find that appellee failed to exercise ordinary care and substantially contributed to his daughter's unauthorized transactions and forgeries under the purview of Ark. Code Ann. § 4-3-406.

Arkansas Code Annotated section 4-3-406 (Repl. 2001) states:

> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
>
> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
>
> (c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

Appellant correctly points out that Arkansas courts have not had many opportunities to provide guidance as to what constitutes negligence under Ark. Code Ann. § 4-3-406(a). The policy behind U.C.C. § 3-406, which is essentially what our State chose to codify under § 4-3-406, appears to be to shift the loss for negligence to the party who was in the best position to have prevented it. *Guardian Life Ins. Co. of America v. Chemical Bank*, 94 N.Y.2d 418 (2000). Courts in other jurisdictions have concluded that the bank customer's failure to promptly discover and report a forgery or unauthorized transaction after it has occurred may also constitute negligence under U.C.C. § 3-406, even though such negligence does not directly contribute to the *making* of a forgery or an alteration. The rationale generally appears to be that such failure to report contributes to the making of subsequent forgeries. *See, e.g., Fundacion Museo de Arte Contemporaneo de Caracas — Sofia Imber v. CBI-TDB Union Bancaire Privee*, 996 F. Supp. 277 (S.D. N.Y. 1998)

(noting that customer's negligence in maintaining and controlling blank checks along with failure to advise bank of the first forgery substantially contributed to the loss); *Kramer v. Chase Manhattan Bank, N.A.*, 653 N.Y.S.2d 546 (1997) (holding that a bank should not be held responsible for losses caused by a customer's failure to safeguard his or her ATM card and PIN and to timely examine statements); *Gulf States Section, PGA, Inc. v. Whitney Nat'l Bank of New Orleans*, 689 So.2d 638 (La. 1997) (finding that checks stolen from unsecured box under printer desk coupled with customer's failure to account for breaks in check numbering and failure to notice employee's substitution of forged account statements supported a finding of negligence on part of customer); *Five Towns College v. Citibank, N.A.*, 489 N.Y.S.2d 338 (1985) (finding that a prolonged delay by a customer in discovering and reporting a forgery may constitute negligence under § 3-406).

In light of this case law, I think we should hold that the trial court applied Ark. Code Ann. § 4-3-406 incorrectly. First, neither appellee, as plaintiff below, nor the trial court reasoned that appellant bank failed to exercise ordinary care in paying or taking the checks, pursuant to Ark. Code Ann. § 4-3-406(b). Second, there is ample evidence that appellee and his wife, as joint account holders, failed to exercise ordinary care and thus substantially contributed to the forgeries. In fact, the trial court found that appellee left the monitoring of all account activities to his very ill wife, that both he and his wife knew of the propensities of their daughter, and that their entire attempt to protect their check books consisted in hiding the purse and the books under the kitchen sink. In addition, appellee's PIN consisted of the same number used for his burglary alarm system, a fact that appears striking when one ostensibly tries to safeguard his ATM cards from unauthorized use by the daughter who is known to try to obtain any means possible to make unauthorized transactions—and when the ATM cards in question are hidden only within a purse under the kitchen sink. Finally, appellee failed to notify appellant of any problem until September 15, 1997. Appellant had no knowledge and, consequently, was unable to do anything about Suzan's forgeries and unauthorized transactions until that date solely because appellee and his wife failed to examine the bank statements and timely notify appellant about the unautho-

rized transactions that they reflected. Thus, appellee's conduct falls squarely under the scope of the cases cited *supra*, holding that a customer's failure to safeguard check books, cards, and PIN, can constitute failure to exercise ordinary care under U.C.C. § 3-406.

It is quite understandable that loving parents will try to provide shelter to their prodigal children, even though the children remain unrehabilitated from propensities that are unsavory. Nevertheless, the decision to house a thieving relative does not absolve one of the duty to exercise common sense regarding family valuables. Although I join the decision to reverse and remand for entry of judgment as prescribed by the majority opinion based on application of Ark. Code Ann. § 4-4-406, I fear that our refusal to reverse and remand under section 4-3-406 sends a powerful, and unsound, message. If the facts in this case do not demonstrate failure to exercise ordinary care under section 4-3-406, what set of facts would ever do so?

A NDREE LAYTON ROAF, Judge, dissenting in part and concurring in part. I would reverse this case because I do not believe that the appellee, John G. Vowell, is entitled to recover any of his losses from appellant Mercantile Bank of Arkansas with regard to the forged checks, and would I reverse and remand with respect to the unauthorized cash withdrawals. First, regarding the checks, I agree with the concurring judge that the trial court erred in finding, pursuant to Ark. Code Ann. § 4-3-406(a) (Repl. 2001), that the Vowells exercised ordinary care in safeguarding their checks from their daughter and her companion while they resided in their home. It is not necessary to reiterate the sad circumstances this family found itself in during the time that the check forgeries took place, for they are set out in the majority opinion. However, I do not believe that simply placing a purse under a kitchen sink, in light of the daughter's history, Ms. Vowell's incapacities, and Dr. Vowell's inattention to family banking matters, constitutes the exercise of ordinary care.

Arkansas Code Annotated section 4-3-406 (Repl. 2001) is titled "Negligence contributing to forged signature or alteration of instrument," and provides:

> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the

making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

(c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

Accordingly, Vowell should be precluded from asserting his losses regarding any of the forged instruments against Mercantile Bank pursuant to § 4-3-406(a). Because the bank did not fail to exercise ordinary care, Vowell is not entitled to allocation of any of his losses pursuant to § 4-3-406(b). Moreover, there is no need to further consider the applicability of Ark. Code Ann. § 4-4-406 (Repl. 2001) pertaining to Vowell's duty to discover and report any unauthorized signatures or alteration of instruments. This is because the two statutes are alternative in nature, according to 6 *Anderson on the Uniform Commercial Code* (3rd ed. 1998), which provides in pertinent part:

In the case of commercial paper that passes through the bank collection process, a preclusion of the drawer or maker of the paper may arise either by virtue of UCC § 3-406 or § 4-406. These sections are alternative in nature, the distinction between the two being made in terms of the time when the precluding conduct occurs. UCC § 3-406 typically relates to conduct prior to the original issue of the paper or contemporaneous therewith while UCC § 4-406 relates to conduct after the paper has been issued.

*Id.* § 3-406:8, at 518.

In 6C *Anderson, supra,* it provides:

"Section 3-406 operates under certain conditions to prevent a purported maker of an instrument whose negligence has contributed to the creation or perpetration of a forgery from recovering

against a good faith drawee. This relates to the maker's conduct before the fact of forgery, whereas § 4–406(1) relates to the maker's conduct afterwards. The two sections clearly involving and require different factual determinations."

While UCC § 3–406 and § 4–406 are limited to particular situations, they indicate a general policy which is to be followed in cases involving other kinds of deception. "The general pattern of these sections is to absolve a payer bank, which has been deceived by a third party, from liability to its customer if the customer's negligence played a substantial part in making the deception possible. However, the bank is absolved from liability only if it has acted with reasonable care or in accordance with reasonable banking standards."

UCC § 4–406 is narrower than UCC § 3–406, as it applies only to the payor bank and its customer.

*Id.* § 4–406:10, at 440–41.

It is clear to me that the Vowells' conduct before the forgery played a "substantial part" in making the deception possible. Consequently, Mercantile Bank should be absolved from any liability with regard to the forged checks, and I dissent from the majority's decision to the contrary.

However, the cash withdrawals that were accomplished using the Vowells's ATM card and pin number compel a different analysis. This is because such transfers are governed by federal law. Indeed, Ark. Code Ann. § 4–4A–108 (Repl. 2001), "Exclusion of consumer transactions governed by federal law," provides:

This chapter [Chapter 4] does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act of 1978 (Title XX, Public Law 95-630, 92 Stat. 3728, 15 U.S.C. 1693 et seq.) As amended from time to time.

15 U.S.C. § 1693a(6) defines "electronic fund transfer" as follows:

[T]he term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point—of-sale transfers, *automated teller machine transactions,*

direct deposits or withdrawals of funds, and transfers initiated by telephone. (Emphasis added.)

Neither Vowell nor Mercantile Bank raised to the trial court the applicability of the federal statute to the cash withdrawals, and the trial court's judgment treats the forged checks and cash withdrawals alike in its analysis of Vowells's right to recover from the bank pursuant to Ark. Code Ann. §§ 4-3-406 and 4-4-406. Clearly, section 4-3-406 pertains to forged instruments and alteration of instruments only, and has no application to cash withdrawals, and section 4-4-406, contained in Chapter 4, excludes funds transfers from its purview.

This court may generally affirm the trial court where it has reached the right result for the wrong reason. *Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002). However, in this instance, it would be impossible to discern the "right result" without reviewing the federal statute. The statute generally limits a customer's liability for unauthorized electronic-fund transfers to the lesser of $50 or the amount of money obtained prior to the time the financial institution was notified of such unauthorized transfer. 15 U.S.C. § 1693(g) (2001). Neither Vowell nor the bank raised this law to the trial court, so it was not a "reason" that the trial court was given the opportunity to consider.

It is worth noting that there is no Arkansas appellate case construing this statute. However, at least one state court has held that a bank customer's failure to notify the bank of an initial unauthorized withdrawal of funds using the customer's ATM card releases the bank of liability for unauthorized transfers some months later. *Kruser v. Bank of America*, 230 Cal. App. 3d 741, 281 Cal. Rptr. 463 (1991). In *Kruser*, the California Court of Appeal held that the customers were put on notice when the first transfer appeared on their bank statement, that the wife's illness did not excuse her failure to notify the bank of the unauthorized transfer, and that the husband's understanding that his wife would review the bank statements did not excuse him from the obligation to notify the bank of any such transfer. These facts are remarkably similar to the case before us.

Nevertheless, I cannot conclude that the finding with regard to the cash withdrawals from Vowell's account should be affirmed

based upon the trial court reaching the right result for the wrong reason. Moreover, bank customers receive notification of ATM withdrawals on their bank statements, and appear to have an obligation pursuant to federal regulation to notify the bank of unauthorized transactions appearing on the statements to avoid further liability. *See* 12 C.F.R. § 205.b. Consequently, I concur in the majority's analysis of Vowell's entitlement to allocation pursuant to Ark. Code Ann. § 4-4-406, only as to the cash withdrawals, and only as to those items paid prior to August 10, 1997, and appearing on the July statements.

NEAL, J., joins.